# United States District Court
## Northern District of Alabama
### Eastern Division

FILED

03 JUL -8  AM 10: 07

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| Families Concerned about Nerve Gas Incineration, et al., | ] |
| | ] |
| **Plaintiffs,** | ] |
| | ] |
| **vs.** | ] |
| | ] |
| United States Department of the Army, et al., | ] |
| | ] |
| **Defendants.** | ] |

**CV-02-BE-2822-E**

**ENTERED**

JUL - 8 2003

### Memorandum of Opinion

1.      **Introduction.**

Presently before the court are the following motions: a motion to dismiss Counts Two

through Six of the complaint for lack of subject matter jurisdiction, filed by defendants United

States Department of the Army, United States Army Anniston Army Depot, United States Army

Program Manager for Chemical Demilitarization, and United States Department of Defense

(collectively "the federal defendants") on February 14, 2003 [Doc. # 14]; a motion to dismiss the

complaint for failure to state a claim upon which relief may be granted, filed by defendant

Westinghouse Government Environmental Services Co., Inc.[1] ("Westinghouse"), on February 14,

2003 [Doc. # 17]; a motion to dismiss Counts Two through Six of the amended complaint for

lack of subject matter jurisdiction, filed by the federal defendants on March 31, 2003 [Doc. # 27];

and a motion to dismiss the amended complaint for failure to state a claim upon which relief may

be granted, or in the alternative, for *Burford* abstention, filed by Westinghouse on March 31,

---

[1]Defendant Westinghouse was incorrectly identified in the complaint as Washington Demilitarization Company, a subsidiary of the Washington Group International, Inc.

39

2003 [Doc. # 29]. The issues raised in the motions have been fully briefed by the parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motions to dismiss are due to be granted in part and denied in part.

**2.    Facts.**

    **a.    The chemical weapons destruction program.**

Prior to 1995, the United States' stockpile of unitary chemical weapons[2] consisted of approximately 30,000 tons of material at nine sites, including the Anniston Army Depot.[3] In 1986, Congress directed the Army to destroy the nation's stockpile of obsolete lethal unitary chemical munitions and agents. In 1993, the United States signed the Chemical Weapons Convention, which requires that signatory nations destroy their stockpiles of unitary chemical weapons. In 1997, Congress directed the Army to destroy its stockpile of unitary chemical weapons by April 29, 2007.

In response to the 1986 congressional mandate, the Army established the Office of the Program Manager for Chemical Demilitarization ("PMCD"). In January 1988, pursuant to the National Environmental Policy Act ("NEPA"), the Army published a Programmatic Environmental Impact Statement ("PEIS") for the demilitarization of its stockpiled unitary chemical weapons. The PEIS contained an analysis of the impacts of various methods for the disposal of these stockpiled chemical weapons. In February 1988, the Army issued a Record of

---

[2]Unitary chemical weapons are ones that contain the chemical agent in an active form. Binary weapons are those in which separate chemical components must be mixed to create the active agent.

[3]The nine sites are: Umatilla, Oregon; Tooele, Utah; Pueblo, Colorado; Pine Bluff, Arkansas; Blue Grass, Kentucky; Anniston, Alabama; Newport, Indiana; Aberdeen, Maryland; and Johnston Atoll, 700 miles southwest of Hawaii.

Decision ("1988 ROD") selecting on-site incineration for the destruction of the chemical weapons stockpiled at all nine sites.

Approximately 4.5 million pounds of chemical weapons, or seven percent of the nation's original stockpile, are stored at Anniston. The chemical weapons stored there include the nerve agents sarin and VX, and the blister agent mustard gas. Various types of munitions, including projectiles, M-55 rockets, and land mines, contain these agents. Consistent with the 1988 ROD, in May 1991, the Army completed a Site-Specific Environmental Impact Statement ("SSEIS") that analyzed the potential site-specific impacts of destroying the stockpile of unitary chemical weapons stored at Anniston. On the basis of that analysis, the Army issued a Record of Decision for the Anniston stockpile ("1991 ROD") on July 12, 1991, in which the Army chose a specific location at which to construct and operate the Anniston Chemical Agent Disposal Facility ("ANCDF"). In February 1996, the Army awarded Westinghouse a contract to construct and operate the ANCDF. Because the chemical weapons stored at Anniston are classified as hazardous waste when they are destroyed, the ANCDF must obtain a hazardous waste facility permit under federal and state hazardous waste laws prior to engaging in operations.

> **b.     Hazardous waste regulation under RCRA.**

Congress enacted the Resources Conservation and Recovery Act of 1976 ("RCRA"), 42 U.S.C. §§ 6901-6992k, to address the increasingly serious environmental and health dangers arising from the generation, treatment, and land disposal of wastes. Of particular concern was the storage, treatment, and disposal of hazardous wastes, for which Congress required the development of a comprehensive regulatory scheme in Subtitle C of RCRA, 42 U.S.C. §§ 6921-6939b.

Congress provided for a federal-state partnership to achieve this objective. A state may seek authorization from the EPA for its hazardous waste management program plan. Upon authorization, the state program operates in lieu of the federal hazardous waste management program, and the state may issue and enforce permits for the storage, treatment, and disposal of hazardous waste. These permits have the same effect as Subtitle C permits issued by the EPA. In 1978, the Alabama legislature enacted the Alabama Hazardous Waste Management and Minimization Act ("AHWMMA"), Ala. Code. §§ 22-30-1 to -24. Under that authority, the state promulgated a hazardous waste management regulatory program designed to ensure that hazardous wastes are managed in a manner that protects human health and the environment and minimizes the generation and land disposal of these wastes. In 1987, the EPA authorized Alabama's hazardous waste management program and authorized Alabama to issue and enforce permits for the storage, treatment, and disposal of hazardous waste. The Alabama Department of Environmental Management ("ADEM") administers the state's hazardous waste management program and issues and enforces permits thereunder.

### 1.   General requirements for permits.

Each owner and operator of a hazardous waste treatment, storage, or disposal facility ("TSD facility") must obtain a permit, which in Alabama is referred to as a hazardous waste operation plan. Permitting for TSD facilities is governed by the provisions of sections 335-14-1 to -9 of the Alabama Administrative Code. *See* Ala. Admin. Code r. 335-15-5-.01(1)(h)(i). A facility seeking to obtain approval of a permit must submit a permit application prior to construction. *Id.* r. 335-14-8-.02. ADEM evaluates the application to determine whether it demonstrates compliance with applicable technical standards. *Id.* r. 335-14-8-.08. If ADEM

4

determines, on the basis of a complete application, to approve a permit for a facility, ADEM

prepares a draft approval and accompanying statement of basis, or fact sheet, publishes the draft

approval, and provides for a public comment period and the opportunity for a public hearing. *Id.*

At the conclusion of the comment period, ADEM issues a decision to approve or deny the

permit. *Id.* r. 335-14-8-.08(12).

### 2.    Specific requirements for incinerator permits.

Hazardous waste incinerators must meet the general requirements applicable to all TSD

facilities, as well as a number of specific requirements, and permitting procedures designed to

ensure that incinerator operations are protective of human health and the environment. *See* Ala.

Code § 22-30-6; Ala. Admin. Code r. 335-14-8-.03(a), (b).

For instance, the operator of an incinerator must conduct a trial burn, which tests the

operation of the incinerator and its emissions to enable ADEM to establish final operating

conditions for the facility. Ala. Admin. Code r. 335-14-8-.06(2). The permit applicant must

submit a proposed trial burn plan containing detailed information sufficient to enable ADEM to

determine whether to approve the plan. *Id.* r. 335-14-8-.06(2)(b)(2). Among other information,

the applicant must submit a detailed analysis of each waste to be burned during the trial burn, a

detailed engineering description of the incinerator, a description of sampling and monitoring

procedures, a test schedule and protocol for each waste to be burned, and a description of

pollution control equipment to be used. *Id.* ADEM will approve the plan, as a modification to the

permit, if it finds, among other things, that the trial burn is likely to determine whether the

incinerator performance standard required by the regulations can be met; the trial burn itself will

not present an imminent hazard to human health or the environment; the trial burn will help

ADEM to determine operating requirements to be specified under the Alabama Administrative Code; and the facility will not present an imminent hazard to human health and the environment. *Id.* r. 335-14-8-.06(2)(b)(5)(ii).

During each trial burn, the operator must analyze the emissions, compute the destruction and removal efficiency ("DRE"), and determine waste residues. Ala. Admin. Code r. 335-14-8-.06(2)(b)(7). The results of this analysis must be submitted to ADEM within 90 days of the trial burn. *Id.* r. 335-14-8-.06(2)(b)(8). Based on the results of the trial burn, ADEM establishes final operating requirements for the full operation of the facility and modifies the facility's permit accordingly. *Id.* r. 335-14-8-.06(2)(b)(11).[4]

Alabama's regulatory program establishes specific performance standards, operating requirements, waste analysis, and monitoring and inspection requirements. Ala. Admin. Code r. 335-14-5-.15(4). Incinerators generally must achieve a DRE of 99.99% for principal organic hazardous constituents ("POHCs"), except that incinerators burning certain listed hazardous wastes, including the chemical agents at Anniston, must achieve a DRE of 99.9999%. *Id.* r. 335-14-5-.15(4)(a)(1), (2). POHCs are identified by ADEM; they are typically the organic hazardous constituents in the materials to be burned that present the greatest degree of difficulty for incineration. *Id.* 335-14-5-.15(3).

To ensure compliance with these standards, a RCRA incinerator permit imposes requirements regulating the composition of material fed to the incinerator and specifies operating

---

[4]ADEM has required the ANCDF to conduct two trial burns for each incinerator unit. The first trial burn used surrogate compounds, *i.e.*, materials that are not chemical agents but that ADEM determined were at least as difficult to incinerate as chemical agents. The second trial burn will use chemical agents. The Army was required to complete all surrogate trial burns and submit the resulting data to ADEM before seeking approval of its trial burn plan for the agent trial burns.

parameters such as the carbon monoxide level in the stack exhaust gas, the rate at which material can be fed into the incinerator, combustion temperature, and allowable variations in system design and operating procedures. Ala. Admin. Code r. 335-14-5-.15(6). The regulations also require that the incinerator have a mechanism that automatically cuts off the incinerator waste feed if the operating conditions deviate from those specified in the plan. *Id.* r. 335-14-5-.15(6)(e).

### 3. Review of operation plan approvals.

The Alabama Administrative Code provides an opportunity for individuals to raise concerns about the operation of a facility at any time. Specifically, the Code provides that "[p]ermits may be modified, revoked and reissued, or terminated either at the request of an interested party (including the permittee) or upon [ADEM's] initiative." Ala. Admin. Code r. 335-14-8-.08(3)(a). Among the appropriate reasons for modification or revocation of a permit is that ADEM has received information that "was not available at the time of permit issuance . . . and would have justified the application of different permit conditions." *Id.* r. 335-14-8-.04(2)(a)(2).

Additionally, ADEM decisions approving an operation plan or modifications to a plan are subject to review before the Alabama Environmental Management Commission ("the Commission"). Ala. Admin. Code r. 335-2-1-.01 to -.30. Any individual who is "aggrieved" by the issuance, modification, denial, or repeal of a permit can request a hearing before the Commission. *Id.* r. 335-2-1-.03. Challenges to plan approvals are designated as contested case proceedings under the Alabama Administrative Procedures Act ("APAA"). Ala. Code § 41-22-3(3). Such proceedings provide the opportunity to present expert and fact witness testimony, to cross-examine witnesses, and to present written briefs and oral argument. Ala. Admin. Code r.

7

335-2-1-.10. The Commission has the authority to stay the effect of an order of ADEM approving a plan, provided the party seeking the stay satisfies a test similar to the preliminary injunction standard. *Id.* r. 335-2-1-.23(5).

A party wishing to challenge ADEM's approval order entered after a contested case proceeding before the Commission may file an appeal with the Alabama Circuit Court in the appropriate county. Ala. Code § 42-22-20(b). The circuit court reviews the Commission's decision on the administrative record to determine whether the decision is supported by substantial evidence. *Id.* § 42-22-20(k).

### C.    The Anniston facility configuration and RCRA permit.

#### 1.    Facility configuration.

ANCDF is intended to operate through a reverse assembly process; that is, assembled chemical weapons such as rockets, land mines, and projectiles are taken apart mechanically by machines capable of operating without workers present. The weapons are drained of their chemical weapons contents. The drained chemical material (collectively "agent") is piped to a tank from which it is fed directly into an incinerator in liquid form. The solid munition components are incinerated separately to destroy any agent remaining on or in them. To accommodate the range of munition configurations (*i.e.*, rockets, mines, bulk munitions, etc.) stockpiled at Anniston, the ANCDF consists of three separate incinerators: a liquid incinerator to incinerate liquid agent that has been drained from munitions and bulk containers; a deactivation furnace to incinerate munitions containing propellants and explosives (collectively "energetics") after they have been drained of as much agent as possible; and a metal parts furnace to thermally

decontaminate metal parts that do not contain energetics, such as projectile and mortar casings and bulk containers, after they have been drained of as much agent as possible.

### 2. The facility's permit.

In May 1996, the Army submitted an application to the State of Alabama seeking the requisite permit to construct and operate the ANCDF pursuant to the state's delegated hazardous waste program. As part of that application, the Army submitted a health risk assessment for the facility. On June 19, 1997, ADEM issued a hazardous waste facility permit ("the permit") to the Army and Westinghouse (collectively "the permittees"). The permit allows the permittees to demilitarize through incineration chemical weapons stored at the Anniston Army Depot ("ANAD"). Consistent with Alabama's hazardous waste program, the permit imposes detailed requirements upon the permittees in conducting trial burns, sampling and analyzing the waste to be destroyed, and monitoring, identifying, and controlling emissions from the ANCDF.

Since completing construction on the ANCDF in June 2001, the permittees have been proceeding with systemization and optimization – an extensive process that tests all components and systems and demonstrates that the ANCDF's equipment, procedures, and personnel are ready to begin destroying chemical agent.  Surrogate trial burns play a critical part of this process. These trial burns test whether each incinerator is capable of achieving a DRE of at least 99.9999% for surrogate materials. The ANCDF permit incorporated the requirements and standards for the surrogate trial burns. The surrogate materials used during these trial burns are at least as difficult to destroy as the chemical agent. The Army conducted surrogate trial burns for the liquid incinerator and deactivation furnace from March to May 2002, and repeated a portion

9

of the liquid incinerator trial burn in October 2002.[5] ADEM approved the results of the

deactivation furnace trial burn on November 1, 2002, and the results of the liquid incinerator trial

burn on December 24, 2002.

Having successfully completed the surrogate trial burns, the permittees must next conduct

agent trial burns, in which actual chemical agent and munitions are fed into the incinerators

under conditions specified in a trial burn plan approved by ADEM. As with the surrogate trial

burns, the purpose of the agent trial burns is to demonstrate that the incinerators achieve the

required DRE when destroying chemical agent and to establish the operating conditions and

waste feed rates that must be observed during normal destruction operations. In June 2002, the

permittees submitted a request for a permit modification to ADEM seeking approval of agent

trial burn plans for the nerve agent GB for the liquid incinerator and deactivation furnace, along

with a revised Screening Risk Assessment ("SRA") Protocol.[6] As part of its review process,

ADEM subjected each of these plans and the revised SRA Protocol to a public comment and

review period from July 18 to September 16, 2002, which included a public information meeting

on August 13, 2002, and a formal hearing on September 3, 2002. ADEM is currently considering

the agent trial burn plans, the revised SRA Protocol, and the comments submitted by the public.

---

[5]The Army conducted the surrogate trial burn for the metal parts furnace in November 2002, for mortars and projectiles, and is in the process of collating data and writing a report of the results for submission to ADEM.

[6]The agent trial burn plans specify the procedures that the Army intends to follow and the objectives it intends to achieve in conducting the agent trial burns. The SRA Protocol details the methodology that the Army intends to use in conducting future health risk assessments. After conducting the agent trial burns, the Army is required to submit to ADEM a risk assessment addendum following the revised risk assessment protocol that compares the results of each trial burn to the data used in the preliminary risk assessment with respect to emission estimates, stack parameters, and toxicity values. If that comparison reveals changes indicating the presence of an unacceptable risk, the Army is required to submit a more detailed post-trial burn risk assessment.

### 3.     Prior judicial review of the ANCDF permit.

One or more of the plaintiffs in this case have challenged the ANCDF permit on two prior occasions. On July 2, 1997, two plaintiffs in the current case administratively challenged the issuance of the permit before the Commission. A contested case proceeding was conducted by a hearing officer. On April 20, 2000, after conducting a lengthy hearing, the hearing officer submitted to the Commission extensive findings of fact, conclusions of law, and a recommendation that the permit be approved as issued. The Commission adopted the hearing officer's report in its entirety on June 20, 2000. That decision was appealed to the Montgomery County Circuit Court, which consolidated that appeal with a case filed by another of the plaintiffs in the instant action. *See Ala. Dep't of Envtl. Mgmt. v. Coosa River Basin Initiative, Inc.*, 826 So. 2d 111, 114 (Ala. 2002). The circuit court issued conflicting opinions in those cases, and both were ultimately appealed – the first case to the Alabama Court of Civil Appeals, and the second to the Alabama Supreme Court.

On January 11, 2002, the Court of Civil Appeals issued a ruling in the case before it, holding, *inter alia*, that the permit approved by ADEM contained a contingency plan that complied with the requirements imposed by rule 335-14-5-.04 of the Alabama Administrative Code. *Families Concerned about Nerve Gas Incineration v. ADEM*, 826 So. 2d 857 (Ala. Civ. App. 2002). On January 18, 2002, the Alabama Supreme Court issued a decision in the case before it, which, among other things, affirmed the Court of Civil Appeals' decision in *Families. Coosa River Basin*, 826 So. 2d at 116.

**D.     Procedural history of the instant litigation.**

Plaintiffs Families Concerned About Nerve Gas Incineration, Serving Alabama's Future Environment, Inc., Coosa River Basin Initiative, Inc., Chemical Weapons Working Group, Inc., Vietnam Veterans of America Foundation, Calhoun County Chapter of the Southern Christian Leadership Conference, Alabama Environmental Council, Citizens for Environmental Justice, Friends of Terrapin Creek, Wild Alabama, Inc., Friends of Rural Alabama, Inc., and Sierra Club (collectively "the plaintiffs"), filed the instant action seeking declaratory and injunctive relief on November 19, 2002, and they amended their complaint on February 14, 2003. [Doc. # 18.] The amended complaint alleges six counts against the defendants. Count One alleges that the federal defendants violated NEPA by failing  to perform a Supplemental EIS in light of significant new information regarding safer alternatives to incineration. This cause of action is purportedly asserted under NEPA.

Count Two alleges that the defendants violated their permit, as well as pertinent sections of the Alabama Administrative Code, in their failure to take necessary actions to prevent and minimize emissions of hazardous wastes and their constituents, and their failure to establish a plan to identify and quantify these chemical releases, assess the hazards posed, and mitigate those hazards. Count Three alleges that the defendants violated pertinent sections of the Alabama Administrative Code in their failure to adequately characterize their hazardous waste and provide an accurate and complete waste characterization in their permit application and trial burn plan.

Count Four invokes 42 U.S.C. § 6972(a)(1)(B) and alleges that substantial new information regarding the dangers of incinerating gelled agent has not been considered in the permitting process, and that the defendants' plan to burn gelled agent-filled rockets presents an

12

imminent and substantial endangerment to human health or the environment. Count Five similarly invokes § 6972(a)(1)(B) and alleges that substantial new information is available that has not been considered in the permitting process, and that the new information renders the forthcoming testing and operations at ANCDF an imminent and substantial endangerment to human health or the environment. Finally, Count Six alleges that the federal defendants have violated the Equal Protection guarantee of the Fifth Amendment by planning to subject the minority populations in and around Anniston to harmful incineration of chemical weapons, while planning to destroy chemical weapons at locations in predominantly European-American communities using more modern, safer alternatives to incineration.

The federal defendants have moved to dismiss Counts Two through Five of the amended complaint for lack of subject matter jurisdiction. [Doc. ## 14, 27.] Westinghouse has moved to dismiss the amended complaint in its entirety for failure to state a claim upon which relief may be granted; in the alternative, Westinghouse has moved for the court to abstain from exercising its jurisdiction (to the extent that it has jurisdiction) under the doctrine of *Burford* abstention. [Doc. ## 17, 29.]

## III.    Standard.

### A.    Rule 12(b)(1).

The federal defendants have moved to dismiss for lack of subject matter jurisdiction. "[W]hen a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1) the district court is free to independently weigh facts, and [must] 'satisfy itself as to the existence of its power to hear the case.'" *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (quoting *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)). The court may consider

13

matters outside the pleadings in ruling on a motion under Rule 12(b)(1). *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991). However, the Eleventh Circuit has cautioned that if the facts necessary to sustain jurisdiction implicate the merits of the plaintiffs' cause of action, the court should "find that jurisdiction exists and deal with the [jurisdictional] objection as a direct attack on the merits of the plaintiff[s'] case." *Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997). The burden of proof on a Rule 12(b)(1) motion is on the party averring jurisdiction. *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942). Finally, although Westinghouse has not moved for dismissal under Rule 12(b)(1), if the court finds that it is without jurisdiction to entertain any of the claims against Westinghouse, it may dismiss them on that basis. *See Marshall v. Gibson's Prods., Inc. of Plano*, 584 F.2d 668, 671-72 (5th Cir. 1979).

### B.      Rule 12(b)(6).

Westinghouse has challenged the sufficiency of the amended complaint under Rule 12(b)(6), which provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. A court may dismiss a complaint under Rule 12(b)(6) only if it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In deciding a Rule 12(b)(6) motion, the court must accept as true all well-pleaded factual allegations and view them in the light most favorable to the plaintiffs. *SEC v. ESM Group, Inc.*, 835 F.2d 270, 272 (11th Cir. 1988). Furthermore, "[a] complaint may not be dismissed because the plaintiff[s'] claims do not support the legal theory [they] rel[y] upon since the court must determine if the allegations provide for relief on *any* possible theory." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116

F.3d 1364, 1369 (11th Cir. 1997) (emphasis in original) (citing *Robertson v. Johnston*, 376 F.2d 43 (5th Cir. 1967)).

## IV.   Discussion.

### A.   The NEPA claim.

Westinghouse has moved to dismiss the claim brought pursuant to NEPA to the extent that the plaintiffs state that claim against it. On the face of the amended complaint, the plaintiffs apparently have stated their NEPA claim against the federal defendants only. However, to the extent that the plaintiffs wish to pursue their NEPA claim against Westinghouse, the court agrees that such a claim is due to be dismissed.

This circuit has established that NEPA does not provide a free-standing private cause of action for violations of its provisions. *Noe v. Metro. Atlanta Rapid Transit Auth.*, 644 F.2d 434 (5th Cir. Unit B May 1981).[7] Rather, claims for violations of NEPA are brought under the administrative procedures act ("APA"), 5 U.S.C. §§ 701-706. The APA provides for judicial review of "agency action." 5 U.S.C. § 702. The parties do not dispute that Westinghouse, as a private entity, is not an agency for purposes of the APA. *See id.* § 701(b)(1) (defining agency as "each authority of the Government of the United States"). Therefore, the plaintiffs cannot assert a NEPA claim against Westinghouse, and to the extent that they purport to do so, that claim is due to be dismissed.

---

[7]*See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

**B.     The Fifth Amendment Equal Protection claim.**

The federal defendants have moved to dismiss the Fifth Amendment Equal Protection claim asserted against them on the basis that the applicable statute of limitations has expired.[8] In their equal protection claim, the plaintiffs allege that the federal defendants' decision to incinerate chemical weapons at ANCDF, which is located in a community made up of a large minority population, while choosing to dispose of chemical weapons in predominantly European-American communities by safer means, constitutes a denial of the equal protection of the laws.

Under 28 U.S.C. § 2401, "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). *See Crown Coat Front Co., Inc. v. United States*, 386 U.S. 503 (1967). Thus, to overcome the statute of limitations defense, the plaintiffs must allege that some violation of their right to equal protection occurred within the six years preceding the filing of the complaint, or on or after November 19, 1996.[9] The Supreme Court has held that statutes of limitation must be strictly construed in suits against the government because they condition the waiver of sovereign immunity necessary to the court's jurisdiction. *See United States v. Mottaz*, 476 U.S. 834, 841 (1986); *Lehman v. Nakshian*, 453 U.S. 156, 160-61 (1981).

To prove their equal protection claim, the plaintiffs will have to establish that an official act, undertaken with a discriminatory purpose, denied them equal protection. *Washington v. Davis*, 426 U.S. 229, 239 (1976). Under federal law, the statute of limitations for a claim alleging an act of discrimination begins to run at "the time of the discriminatory act." *Chardon v.*

---

[8]The amended complaint makes it clear that the equal protection claim is asserted "against the named federal defendants only." (Amended Compl. ¶ 110.)

[9]The complaint was filed on November 19, 2002. [Doc. # 1, Compl.]

16

*Fernandez*, 454 U.S. 6, 8 (1981). The difficult task in this case is determining whether a discriminatory act occurred within the limitations period.

The federal defendants argue that the alleged discriminatory act occurred in 1991, when the Army issued its decision to incinerate the stockpile of chemical weapons at Anniston. However, the plaintiffs claim that the discriminatory act occurred sometime between 1998 and 2003, when the Army decided to use safer means of disposing of chemical weapons at sites near mainly European-American populations, but failed to  make a decision to implement the safer means of weapons disposal at ANCDF. While the plaintiffs generally aver that a discriminatory act occurred sometime between 1998 and 2003, they point to no specific act occurring during that time. In fact, the equal protection claim is premised on the federal defendants' *failure* to act during the limitations period; the plaintiffs allege that the federal defendants "could have chosen to change from incineration to one or more non-incineration technologies for Anniston, but refused to do so." [Doc. # 33, at 19.] The court is of the opinion that, because the statute of limitations must be strictly construed in suits against the government, the foregoing allegation falls short of establishing that a discriminatory *act* occurred within the limitations period so as to invoke the court's jurisdiction. As such, the equal protection claim is untimely, and it is due to be dismissed.

### C.    Counts Four and Five.

The plaintiffs' remaining claims are brought pursuant to RCRA's citizen suit provision, which provides:

> Except as provided in subsection (b) or (c) of this section, any person may commence a civil action on his own behalf –

17

> (1)(A) against any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this Act; or
>
> (B) against any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a). Actions commenced under subsection (a)(1)(B) of § 6972 are limited by, *inter alia,* subsection (b)(2)(D), which provides that "No action may be commenced under subsection (a)(1)(B) by any person . . . with respect to the siting of a hazardous waste treatment, storage, or a disposal facility, nor to restrain or enjoin the issuance of a permit for such facility." *Id.* § 6972(b)(2)(D).

The defendants allege that Counts Four and Five, which invoke subsection (a)(1)(B) of the citizen suit provision, seek to enjoin activities that are allowed under the permit, and are therefore barred by the limitation contained in subsection (b)(2)(D). Counts Four and Five allege that substantial new information, previously not considered in the permitting process, compels the conclusion that the operation of ANCDF pursuant to its permit presents an imminent and substantial endangerment to human health or the environment.

Although subsection (b)(2)(D) on its face limits only actions to restrain or enjoin the issuance of a permit, a number of courts have held that it also prevents citizen suits under (a)(1)(B) seeking to enjoin or prevent any permitted activity, or so-called collateral attacks on the permitting process. *See, e.g., Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 973 (7th Cir. 2002) ("[Subsection (a)(1)(B)] may not be used to prevent operation of a waste disposal facility."); *Chemical Weapons Working Group, Inc. v. United States Dep't of the Army*, 111 F.3d 1485, 1492 (10th Cir. 1997) ("[RCRA] does not allow collateral attacks on [EPA] permit

decisions or those of state agencies with federally-delegated authority."); *Coalition for Health Concern v. LWD, Inc.*, 60 F.3d 1188, 1192 (6th Cir. 1995) (holding court was without jurisdiction to entertain citizen suit that was nothing "other than a collateral attack on Kentucky's hazardous waste permitting process"); *Greenpeace, Inc. v. Waste Techs. Indus.*, 9 F.3d 1174, 1178 (6th Cir. 1994) ("[I]t is clear that Congress did not intend for § 6972(a)(1)(B) to authorize citizen suits against persons operating hazardous waste facilities within the limits of valid RCRA permits."); *Palumbo v. Waste Techs. Indus.*, 989 F.2d 156, 159 (4th Cir. 1993) ("The RCRA judicial review provision plainly forbids [a collateral] attack [on permitting decisions.]").

The legislative history of §§ 6972(a)(1)(B) and (b)(2)(D) underscores that citizens may not bring subsection (a)(1)(B) suits to challenge permitted activity. Specifically, the House Report accompanying the legislation adding the citizen suit provision states with respect to the limitations on courts' ability to hear citizen suits, "[t]he Committee believes that other legal authority is available to challenge deficiencies in the permitting process." H.R. Rep. No. 98-198(I), at 53 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5612. The court concludes that the plaintiffs' claims in Counts Four and Five of their Amended Complaint amount to nothing more than a collateral attack on the permitting process, which § 6972(b)(2)(D) prohibits the court from hearing. As such, the court is without jurisdiction to entertain these claims.

The court reaches this conclusion notwithstanding the plaintiffs' assertion that their claims cannot be considered collateral attacks on the permitting process because they are premised on new information that was unavailable during the permitting process. The language of § 6972(b)(2)(D) does not contemplate any exception for imminent hazard citizen suits based on information developed after the permit was initially issued. Moreover, the plaintiffs have had

19

and continue to have ample opportunity to present this new information to ADEM. Specifically,

ADEM had a comment period on the proposed agent trial burn plans from July to September

2002, and because ADEM has yet to act on the agent trial burn plan, the plaintiffs may submit

new information even now. Moreover, as described *supra*, in section II.B.3, the plaintiffs can

challenge ADEM's future decisions with respect to the defendants' permit before the

Commission and in the appropriate state circuit court. The fact that the plaintiffs have had and

continue to have opportunities to provide new information to ADEM supports the court's

determination that Counts Four and Five represent an impermissible collateral attack on the

permitting process. The court, therefore, concludes that it  lacks jurisdiction to consider these

claims, and the motions to dismiss are due to be granted with respect to Counts Four and Five of

the amended complaint.[10]

> **D.     Counts Two and Three.**

The defendants argue that Counts Two and Three of the amended complaint, like Counts

Four and Five, raise claims under subsection (a)(1)(B) challenging the operation of the facility

pursuant to the permit, and are thus barred by subsection (b)(2)(D). However, upon careful

analysis of the allegations of the amended complaint, the court is of the opinion that the claims

contained in Counts Two and Three support a claim under subsection (a)(1)(A) for violation of a

permit or applicable law, and are therefore not subject to the limitation of subsection (b)(2)(D).

Specifically, Count Two alleges that the defendants "are in violation of [pertinent sections of the

---

[10]Moreover, the fact that the permitting process is not complete, and that the plaintiffs have multiple
additional avenues for review, in the administrative proceedings themselves, as well as in state court, raises a
question about whether the issues raised in Counts Four and Five are ripe for review. *See, e.g., Ala. Power Co.
v. United States Dep't of Energy*, 307 F.3d 1300 (11th Cir. 2002). Because the court finds it is otherwise without
jurisdiction over these claims, however, it need not address the issue of ripeness, which was not raised or briefed
by the parties.

Alabama Administrative Code] because they have failed to take necessary actions to prevent and minimize emissions of hazardous wastes," (Amended Compl. ¶ 67). Count Three alleges that the defendants "are in violation of [pertinent sections of the Alabama Administrative Code] by not adequately characterizing their hazardous waste," (*Id.* ¶ 75). These counts, which allege violations of regulations that are effective pursuant to RCRA, state claims under 42 U.S.C. § 6972(a)(1)(A), and are thus not affected by subsection (b)(2)(D)'s limitation. Therefore, the court has jurisdiction over the claims stated in Counts Two and Three of the amended complaint. Concluding that these counts state claims over which this court has jurisdiction, however, does not end the inquiry.

### 1. Rule 19.

Defendant Westinghouse argues that, to the extent the court concludes it has jurisdiction over any of the plaintiffs' RCRA claims, those claims are due to be dismissed for failure to join an indispensable party under Rule 19 of the Federal Rules of Civil Procedure. That rule provides:

> (a) A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest, or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. . . .

Fed. R. Civ. P. 19(a).

Westinghouse argues that the State of Alabama and ADEM, both of whom possess sovereign immunity under the Eleventh Amendment, *see Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 142-46 (1993), are indispensable parties, and because they

cannot be joined, the action should be dismissed. *See* Fed. R. Civ. P. 19(b). Specifically,

Westinghouse alleges that the State and ADEM have an interest in the subject of the action

because the action is a "challenge to the permitting process established and regulated by these

entities." (Doc. # 29, at 6.) Notwithstanding this alleged interest in the subject of the action,

Westinghouse has not established that the State's and ADEM's ability to protect their alleged

interest will be in any way impaired by disposition of the instant action in their absence.

> Moreover, the court finds persuasive the reasoning of another district court, which noted:

> it has been long settled that federal and state agencies that administer federal
> environmental programs are not necessary, let alone indispensable, parties to
> citizen suits to enforce permitting and other . . . environmental requirements
> against alleged violators. *See, e.g.*, [*Friends of the Earth v. Carey*, 535 F.2d 165,
> 173 (2d Cir. 1976)] ("since it is [the governmental agency's] failure to obtain
> compliance and to seek enforcement that brings the citizen suit into play, it would
> defeat the very purpose of that enforcement mechanism to require that the
> [agency] be dragged reluctantly into the enforcement proceedings"); *Metro. Wash.
> Coalition for Clean Air v. District of Columbia*, 511 F.2d 809, 814-15 (D.C. Cir.
> 1975) (when citizen proceeds directly against violator, government agency "has
> the right to intervene in the suit, but [it] is not required to be a participant in such
> litigation and [its] absence does not render the action infirm"); *Student Pub.
> Interest Research Group v. Monsanto Co.*, 600 F. Supp. 1479, 1484 (D.N.J. 1985)
> (no government agency interests impaired or impeded by citizen suit because
> "[t]he agencies, after all, are not free to condone violations of permits they issued
> while those permits are still in effect").

*Sierra Club v. Young Life Campaign, Inc.*, 176 F. Supp. 2d 1070, 1078 (D. Colo. 2001). *See also*

*Sierra Club v. SCM Corp.*, 572 F. Supp. 828 (W.D.N.Y. 1983). For the foregoing reasons, the

court is of the opinion that neither the State of Alabama nor ADEM is an indispensable party to

the instant action, and that Rule 19 therefore does not require dismissal of this matter.

### 2.   *Burford* abstention.

Finally, Westinghouse argues that, to the extent that the court concludes it has jurisdiction

over any or all of the plaintiffs' claims, the court should abstain from exercising that jurisdiction

under the doctrine of *Burford* abstention[11]. The Supreme Court summarized the doctrine in *New*

*Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350 (1989):

> Where timely and adequate state-court review is available, a federal court sitting
> in equity must decline to interfere with the proceedings or orders of state
> administrative agencies: (1) when there are 'difficult questions of state law
> bearing on policy problems of substantial public import whose importance
> transcends the result in the case then at bar'; or (2) where the 'exercise of federal
> review of the question in a case and in similar cases would be disruptive of state
> efforts to establish a coherent policy with respect to a matter of substantial public
> concern.' *Colorado River Water Conservation Dist. v. United States*, 424 U.S.
> [800,] 814 [(1976).]

*New Orleans Pub. Serv.*, 491 U.S. at 361.

Although the court concludes that timely and adequate state-court review is available to

redress the issues raised by the plaintiffs in this action, *see supra* II.B.3, the court concludes that

*Burford* abstention is not warranted in the instant case. First, Westinghouse has not convinced

the court that its exercise of jurisdiction would be *disruptive* of the state's efforts to establish a

coherent policy with respect to the admittedly important matter of the disposal of hazardous

wastes.

Additionally, while Westinghouse has cited a number of cases from other jurisdictions in

which courts have abstained from exercising their jurisdiction in suits of this nature, an equal

number of similar suits exist in which courts have declined to abstain. The court finds

---

[11]The *Burford* absention doctrine is used to avoid conflict with a state's administration of its own affairs. *See Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). *Burford* abstention applies only if a federal court's decision on a state law issue is likely to "interfere with the proceedings or orders of state administrative agencies." *See New Orleans Pub. Serv. Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989).

particularly relevant a case decided by another court in this circuit. In *College Park Holdings,*
*LLC v. Racetrac Petroleum, Inc.*, 239 F. Supp. 2d 1322 (N.D. Ga. 2002), the court noted that the
decision to abstain lies within the court's discretion, and that the Eleventh Circuit will reverse
such a decision only "upon a showing of abuse of discretion." *College Park*, 239 F. Supp. 2d at
1327. The court further noted that "abstention cannot be invoked solely because a federal court
action involves a state's handling of its own affairs." *Id.* Particularly relevant to that court's
decision not to abstain in the RCRA citizen suit before it was the fact that "Congress has told the
court to" exercise its jurisdiction over RCRA cases. *Id.* at 1328. *See* 42 U.S.C. § 6972(a)(1)
(authorizing citizen suits). The court concluded that under the statutory scheme, which
"contemplates citizen suits as a supplement to state government action, . . . the court could not, in
good faith, unilaterally strip United States citizens of rights given them by their government." *Id.*
at 1329.

Like the court in *College Park*, this court concludes that to apply *Burford* abstention in
the instant case "would do injustice to the long-standing principle that courts of the United States
'have no more right to decline the exercise of jurisdiction which is given, than to usurp that
which is not given. The one or the other would be treason to the Constitution.'" *Id.* (quoting
*Cohens v. Va.*, 19 U.S. (6 Wheat) 264, 403 (1821)). The court, therefore, declines to apply the
*Burford* abstention doctrine to the present citizen suit under RCRA.

**V.    Conclusion.**

To the extent that the plaintiffs have asserted a NEPA claim in Count One against
Westinghouse, that claim is due to be dismissed.  However, the federal defendants did not move
to dismiss Count One and therefore that claim remains pending against the federal defendants.

The defendants' motion to dismiss Counts Two and Three are due to be denied.  However, the defendants' motion to dismiss Counts Four and Five are due to ge granted because the court lacks subject matter jurisdiction over those claims.  The plaintiffs' equal protection claim against the federal defendants in Count Six is also due to be dismissed for lack of subject matter jurisdiction.  The remaining claims in this lawsuit are as follows: Count One against the federal defendants; Count Two against all defendants; and Count Three against all defendants.  The court will enter an appropriate order in conformity with this memorandum of opinion.

DONE and ORDERED  this _____ of July, 2003.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE