## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **FAMILIES CONCERNED ABOUT NERVE GAS INCINERATION, et al.,** | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| **v.** | } | **CASE NO. 1:02-CV-2822-RDP** |
| | } | |
| **UNITED STATES DEPARTMENT OF THE ARMY, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

The court has before it the Motion for Summary Judgment filed on behalf of Defendants United States Department of the Army, Anniston Army Depot, Army Chemical Materials Agency (provisional), and the United States Department of Defense (collectively "Federal Defendants") (Doc. # 55) and the Motion for Summary Judgment filed on behalf of Defendant Westinghouse Government Environmental Services Co., Inc. ("Westinghouse") (Doc. # 63). The motions have been fully briefed, and the court heard oral argument on February 15, 2005.

This case concerns the operations of the chemical weapons incinerator in Anniston, Alabama formally designated as the Anniston Chemical Demilitarization Facility ("ANCDF"). Plaintiffs contend in this case that the Federal Defendants and their co-permittee and outside contractor, Westinghouse, are currently violating certain portions of Alabama's hazardous waste laws in their operation of the incinerator. Plaintiffs seek, among other relief, an injunction to shut the incinerator down entirely.

For the reasons outlined below, the court finds that Defendants' motions for summary judgment are due to be granted because there are no disputed issues of material fact and Defendants have demonstrated that they are entitled to judgment as a matter of law.

## I.      Legal Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *See id.* at 323.  Once the moving party has met his burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

II.     **Relevant Undisputed Facts**[1]

Congress enacted the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k, to address problems associated with the management and disposal of wastes. RCRA establishes a "cradle-to-grave system" for regulating the disposal of solid and hazardous waste. *United States v. ILCO, Inc.*, 996 F.2d 1126, 1130 (11th Cir.1993). RCRA contemplates a federal-state partnership to implement its provisions wherein a state may receive authorization from the United States Environmental Protection Agency ("EPA") for its hazardous waste management program. 42 U.S.C. §§6921-6939b. A state's EPA-approved program under RCRA operates "in lieu of the federal program," and the state may issue and enforce permits, which in turn have the same effect as RCRA permits issued by the EPA. 42 U.S.C. § 6926(b).

A.      **Alabama's Hazardous Waste Management Program**

In 1978, the Alabama legislature enacted the Alabama Hazardous Waste Management and Minimization Act ("AHWMMA"), Ala. Code §§ 22-30-1 to -24. Under that authority, the state promulgated a hazardous waste management regulatory program designed to ensure that hazardous wastes are managed in a manner that protects human health and the environment and minimizes the generation and land disposal of these wastes. In 1987, EPA authorized Alabama's hazardous waste management program, thereby authorizing Alabama to issue and enforce permits for the storage treatment and disposal of hazardous waste. Each owner and operator of a hazardous waste treatment, storage, or disposal facility must obtain a permit. In Alabama, this is referred to as a hazardous waste operation plan and these activities are administered by the Alabama Department of

---

[1]     If facts are in dispute, they are stated in the manner most favorable to the Plaintiffs. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

Environmental Management ("ADEM").   Alabama's RCRA regulatory requirements establish specific performance standards, operating requirements, waste identification and analysis standards, and monitoring and inspection requirements.  (ADEM Admin. Code R. 335-14-5-.15(4)).

ADEM has established a lengthy and detailed process that must be followed for an owner or operator to obtain a RCRA permit.  A facility seeking to obtain approval of a permit must submit a permit application prior to construction.  (ADEM Admin. Code R. 335-14-8-.02).  ADEM evaluates the application (prior to construction) to ensure that there will be compliance with applicable technical standards. (ADEM Admin. Code R. 335-14-8-.08).  If ADEM determines, upon receipt of a complete application, that a facility permit is due to be approved, ADEM then prepares a draft approval and accompanying statement of basis (*i.e.*, a fact sheet), publishes the draft approval, and provides for a public hearing. (ADEM Admin. Code R. 335-14-8-.08).  At the conclusion of the public comment period, ADEM issues a decision approving or denying the permit.  (ADEM Admin. Code R. 335-14-8-.08(12)).

Hazardous waste incinerators must meet general requirements applicable to all hazardous waste treatment, storage or disposal facilities, as well as certain specific requirements and permitting procedures.  All of these requirements are intended to ensure that the operation of the incinerator will protect human health and the environment.  (Ala. Code § 22-30-6 and ADEM Admin. Code R. 335-14-8-.03(a) & (b)).

The Alabama Administrative Code provides an opportunity for individuals to raise concerns at any time about the operation of a facility.  Specifically, the Code provides that "[p]ermits may be modified, revoked and reissued, or terminated either at the request of an interested party (including the permittee) or upon [ADEM's] initiative." (ADEM Admin. Code R. 335-14-8-.08(3)(a)).  Among

the appropriate reasons for modification or revocation of a permit is that ADEM has received information that "was not available at the time of permit issuance . . . and would have justified the application of different permit conditions." (ADEM Admin. Code R. 335-14-8-.04(2)(a)(2)).

Additionally, ADEM decisions approving an operation plan or modifications to a plan are subject to review before the Alabama Environmental Management Commission ("the Commission"). (ADEM Admin. Code R. 335-2-1-.01 to .30). Any individual who is "aggrieved" by the issuance, modification, denial, or repeal of a permit can request a hearing before the Commission. (ADEM Admin. Code R. 335-2-1-.03). Challenges to plan approvals are designated as contested case proceedings under the Alabama Administrative Procedures Act ("APAA"). Ala. Code § 41-22-3(3). Such proceedings provide the opportunity to present expert and fact witness testimony, to cross-examine witnesses, and to present written briefs and oral argument. (*E.g.*, ADEM Admin. Code R. 335-2-1-.10). A party wishing to challenge ADEM's approval order entered after a contested case proceeding before the Commission may file an appeal with the Alabama circuit court in the appropriate county. Ala. Code § 42-22-20(b). The circuit court reviews the Commission's decision on the administrative record to determine whether the decision is supported by substantial evidence. Ala. Code § 42-22-20(k).

### B.   ANCDF's Permit

The chemical weapons stored at the Anniston Army Depot are regulated as characteristic wastes, and residues from the management of chemical weapons are regulated as hazardous waste if the residues exhibit a hazardous waste characteristic. (ADEM Admin Code R. 335-14-2-.04; Hardy Depo. at 57-58; Doc. # 57, Ex. 1). Accordingly, the operator of ANCDF was required to

obtain a hazardous waste facility permit from ADEM prior to commencing operation.[2]

On June 19, 1997, after a lengthy permit process which involved numerous exchanges and meetings between the permittees and ADEM and a public notice and comment period, (Hardy Depo. at 9-22),  ADEM issued a hazardous waste facility permit to Defendants for operation of ANCDF. That permit contains provisions specifying the inspection, monitoring, contingency plan, and waste sampling requirements applicable to the facility.  (Doc. # 57, Ex. 1).  ADEM used the permit conditions established for the Army's Tooele, Utah Chemical Demilitarization Facility ("TOCDF") as a model to develop the permit conditions for ANCDF.  (Hardy Depo. at  15). Although ANCDF is broadly based on the design of TOCDF, numerous changes were made in the design of ANCDF to reflect the experience gained in operation of TOCDF and other facilities.  (Doc. # 64, Ex. 22 at 28, 29, 32, 122-25, 129-30, 223-25, 234-35).  Moreover, the mix of materials to be processed at the TOCDF and ANCDF is different and the facilities have different managers and operators.  (Id.).[3]

---

[2]    ANCDF's purpose is to destroy the 4.5 million pounds of chemical weapons stored at the Anniston Army Depot in Anniston, Alabama.  ANCDF consists of three separate incinerators: a liquid incinerator to incinerate liquid agent that has been drained from munitions and bulk containers; a deactivation furnace to incinerate munitions containing propellants and explosives (collectively "energetics") after they have been drained of as much agent as possible; and a metal parts furnace to decontaminate thermally and destroy chemical agents in metal parts, such as projectile and mortar casings and bulk containers, after they have been drained of as much agent as possible.  (Garrett Dec. at ¶ 8).

[3]    Despite these undisputed differences in TOCDF and ANCDF, many of Plaintiffs' alleged material facts relate to events that occurred at TOCDF.  The fact that an incident may have occurred at TOCDF is not evidence that Defendants are in violation of their permit or regulatory obligations at ANCDF.  Although this opinion addresses the merits of Plaintiffs' TOCDF arguments, the court finds that most of the events that occurred at TOCDF are immaterial to the allegations in this case.

Before it began agent operations, ANCDF also had to undergo a series of trial burns. The first set of trial burns did not involve chemical agents, but rather surrogate compounds[4] that tested the facility's ability to operate properly and to destroy chemical agents. (Hardy Depo. at 27-29). During these surrogate trial burns, the facility's emissions were monitored to determine that emissions from the facility do not pose a threat to human health or the environment. (Garrett Decl. ¶ 32). Before the facility could move to the next stage, which is a trial burn involving actual chemical agent containing munitions, ADEM had to approve ANCDF's report on the surrogate trial burns and ANCDF's agent trial burn plan. (Hardy Depo. at 29-39). Surrogate trial burns were completed in 2002, and ANCDF submitted the results to ADEM. (Garrett Decl. ¶ 33). ANCDF also submitted an agent trial burn plan to ADEM as a modification of the permit. ADEM approved the agent trial burn plan as a major modification of the permit on July 30, 2003. (Doc. # 57, Ex. 4). As of December 2003, ANCDF was processing munitions containing the nerve agent GB. (Garrett Dec. ¶ 39).

Gerald Hardy is Chief of the Land Division, the ADEM division responsible for the ANCDF permit. (Hardy Depo. at 8) Hardy is the person at ADEM who is most knowledgeable about the permitting process for the incinerator. (Hardy Depo. at 49-50). Although Hardy is somewhat removed from the day-to-day oversight of ANCDF and the permit, (Hardy Depo. at 10), he supervises the staff that has done the detail review of ANCDF from 1990 to the present. (Doc. # 62,

---

[4]   The surrogate is a mixture of chemical compounds that the permitting authority has scientifically determined to be more difficult to destroy than the chemical agents. (Garrett Decl. ¶ 32).

Ex. 4, at 50).[5]   Timothy K. Garrett is the Army's Site Project Manager for ANCDF.    (Garrett Depo. at 7).

### C.    Administrative Hearing Challenging ADEM's Issuance of the Permit

As noted earlier, applicable Alabama law allows ADEM's permit decisions, including modifications to permits, to be challenged by any person or association in an evidentiary administrative hearing before a Hearing Officer designated by the Commission.  (Ala. Code §22-22A-7).  On July 2, 1997, two of the Plaintiffs in the current case, Families Concerned About Nerve Gas Incineration ("Families") and Serving Alabama's Future Environment, Inc., ("SAFE") filed a request with the Commission challenging ADEM's issuance of the original permit.  After the longest hearing proceedings in the history of the Commission, including the taking of extensive testimony from both sides, the Hearing Officer submitted to the Commission 662 pages of findings of fact and conclusions of law, along with the recommendation that the permit be approved as issued.  On June 20, 2000, the Commission adopted the Hearing Officer's 662-page report in full.

The Hearing Officer concluded that, in compliance with regulatory requirements, Defendants appropriately identified all of the various hazardous wastes that the munitions could contain including the products from incineration, decontamination, and age -- and that this information was

---

[5]    Defendants' summary judgment submissions rely, in part, on the testimony of Hardy. Plaintiffs claim that Hardy lacks personal knowledge of whether ANCDF has or is violating the permit. (Doc. # 65, at 2).  The court disagrees.  The undisputed evidence demonstrates that ADEM has two inspectors at ANCDF twenty-four hours a day, seven days a week. (Love Depo. at 126). Hardy, as Chief of the Land Division, is responsible for regulating ANCDF.  Hardy's deposition testimony makes clear that he testified on the basis of personal knowledge regarding the development of specific permit conditions for ANCDF and ANCDF's compliance with the permit. (Doc. # 62, Ex. 3 at 50-59).  Thus, the court will consider Hardy's testimony that, in the opinion of ADEM, ANCDF has not violated the permit or Alabama RCRA regulations relating to waste characterization and the Contingency Plan.  (Doc. # 62, Ex. 3 at 50-59).

specified in the lists of hazardous wastes that were included in the permit application at Tables C-1-13, -14 and -15.  (Doc. # 62, Ex. 1, Recommendation of Hearing Officer at 537, 619 Finding 7).  The Hearing Officer also concluded that the identification of hazardous wastes which would be, or are likely to be, present for treatment at the facility could be conducted in compliance with Alabama's RCRA rules either by sampling and analysis or by applying the generator's knowledge of the materials for the processes that generated the wastes.  (Doc. # 62, Ex. 1, Recommendation of Hearing Officer at 621, Conclusion of Law 1, *citing* ADEM Admin. Code R. 335-14-2-.02(1)(a)2.(ii)).

The Army conducted a study of chemical agent degradation compounds, and this information was included in the permit application.  (Recommendation of Hearing Officer at 538). The Hearing Officer found that the permit application properly identified the following individual hazardous wastes: (1) arsenic (Doc. # 62, Ex. 2, Transcript of Administrative Hearing at 2140; *see also* ADEM Admin. Code R. 335-14-2-.03(5) Table 1);  (2) mercury (Transcript of Administrative Hearing at 2140; *see also* ADEM Admin. Code R. 335-14-2-.03(5) Table 1);  (3)  Low pH (highly acidic) wastes (Transcript of Administrative Hearing at 2140; *see also* ADEM Admin. Code R. 335-14-2-.03(5) Table 1); and (4)  Lewisite (an arsenic based agent) (Recommendation of Hearing Officer at 507-08).

In issuing the hazardous waste permit for ANCDF, ADEM had determined that the Defendants had used generator knowledge to adequately characterize the chemical weapon agents and chemical weapon-containing munitions to be processed in the facility.  (Hardy Depo. at 39-40; Doc. # 57, Ex. 8 at 2-3).  At the administrative hearing, evidence was presented to show that the nature of the chemical weapons would make the sampling of each container too dangerous for the

9

benefit that might be derived, particularly given that the generator had knowledge of the materials likely to be present in the chemical weapons. (Transcript of Administrative Hearing at 3928). Based on that testimony, the Commission adopted the Hearing Officer's determination that ADEM has the discretion under ADEM Admin. Code R. 335-14-8-.02(1)(c) to approve the Army's use of "generator knowledge" and relevant information to characterize the waste without sampling each individual weapon or munition. (Recommendation of Hearing Officer at 539; at 619-20 ¶¶ 6-10; at 621-22, Conclusions of Law 1, 4 & 5).

The Hearing Officer and the Commission also concluded that Defendants properly characterized their hazardous waste according to the applicable regulations and also properly disclosed this characterization in the permit application. (Recommendation of Hearing Officer at 539-40; at 617-20; at 622, Conclusions of Law 2-5). The Commission, through its Hearing Officer, determined that the facts presented during the hearing supported a decision by ADEM that the initial permit application was complete as required by ADEM Admin. Code Ch. 335-14-8. (Recommendation of Hearing Officer at 622, Conclusions of Law 2-5).

### D.    State Court Appeal of Administrative Findings

Families and SAFE, the Petitioners in the Administrative Hearing, appealed the Commission's June 20, 2000 decision to the Circuit Court of Montgomery County, Alabama. The Circuit Court affirmed the issuance of the permit, and those Plaintiffs appealed to the Alabama Court of Civil Appeals. In a lengthy opinion that discussed the evidence in the Hearing Officer's Recommendation supporting the Commission's decision, the Court of Civil Appeals affirmed the permit in its entirety. *Families Concerned about Nerve Gas Incineration v. ADEM*, 826 So. 2d 857 (Ala. Civ. App. 2002). The Court of Civil Appeals quoted the Hearing Officer's findings that the

contingency plan submitted in the permit application met all applicable requirements and concluded that those findings were fully supported by the record. *Families*, 826 So.2d at 872.

At the same time that the Montgomery County Circuit Court considered the permit appeal, it also considered a separate declaratory judgment action filed by Coosa River Basin Initiative, Inc. ("CRBI"), another of the Plaintiffs in the present case. The Circuit Court issued an opinion in CRBI that conflicted with the court's opinion in the permit appeal. The separate CRBI decision was appealed to the Alabama Supreme Court, primarily over the Circuit Court's holding that one provision of the permit constituted a rule and, thus, violated the rule-making procedures required by Alabama's Administrative Procedures Act. The Supreme Court reversed the Circuit Court. Noting that the identical issue had been thoroughly analyzed by the Court of Civil Appeals in *Families*, the Supreme Court found that the holding in *Families* as to that issue was dispositive and that the permit's provision was not a "rule" requiring notice and comment. *Ala. Dep't of Envtl. Mgmt. v. Coosa River Basin Initiative, Inc.*, 826 So. 2d 111, 116 (2002).

## III.   This Court Has Subject Matter Jurisdiction Over Plaintiffs' Claims

By order dated February 17, 2005, the court ordered the parties to address whether or not this court has subject matter jurisdiction over Plaintiffs' alleged violations of state law, taking into account the following comments by the Eleventh Circuit in *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993 (11th Cir. 2004):

> In so concluding, we note that the RCRA's citizen-suit provision contains language very similar to that contained in the CWA's citizen-suit provision. *See* 42 U.S.C. § 6972(a)(1)(A) (conferring jurisdiction over citizen suits alleging a "violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter"). **We express no opinion as to whether the language in the RCRA grants federal courts jurisdiction over citizen suits alleging a violation of an EPA-approved state law under the RCRA. The issue**

> **under the RCRA is more complicated than under the CWA because a state's**
> **EPA-approved program under the RCRA operates "in lieu of the federal**
> **program."** 42 U.S.C. § 6926(b); *compare Ashoff v. City of Ukiah*, 130 F.3d 409, 411
> (9th Cir.1997) (holding that the RCRA authorizes jurisdiction over citizen suits based
> on the federal minimum standards, but not over state standards that exceed the
> federal minimums), *with City of Heath v. Ashland Oil Co.*, 834 F.Supp. 971, 979
> (S.D.Ohio 1993) (determining that a "citizen suit is not available in an authorized
> state for an alleged violation of a federal provision superseded by state law" and
> noting that "there is a clear position among several courts that an (sic) RCRA citizen
> suit is not available to enforce a state authorized program"), *and Chemical Weapons*
> *Working Group, Inc. v. United States Dep't of the Army*, 990 F.Supp. 1316, 1319
> (D.Utah 1997) (holding that once the EPA authorized Utah to administer the
> provisions of the RCRA, "the federal statute was no longer applicable," and allowing
> suit only for alleged violations of state law). EPA-approved state programs under the
> CWA do not operate "in lieu" of the federal CWA program.

*Parker*, 386 F.3d at 1006 n.13 (emphasis added).  The court notes that the EPA, the federal agency

primarily responsible for implementing RCRA, has articulated its view that citizen suit jurisdiction

under RCRA *is available* to address violations of state RCRA requirements in authorized states.  49

Fed. Reg. 48,300, 48,304 (Dec. 12, 1984); 45 Fed. Reg. 85,016, 85,020-85,021 (Dec. 24, 1980); *see*

*Lutz v. Chromatex, Inc.*, 725 F. Supp. 258, 261-62 (M.D. Pa. 1989).

Although the Eleventh Circuit has raised a substantial question regarding whether this court

has jurisdiction over citizen suits alleging a violation of an EPA-approved state law under RCRA,

the parties believe that the court has jurisdiction in this case, and the court concludes that is the better

view.  Nonetheless, it is a close call given that a state's EPA-approved program under RCRA

operates "in lieu of the federal program."[6]

---

[6]     The courts who have considered the issue have distinguished between citizen suits alleging
a violation of a *federal* RCRA requirement that has been superceded by a state program and those
suits that allege a violation of a *state* RCRA requirement that operates in lieu of the federal program.
With respect to the former, courts have generally concluded that there is no federal jurisdiction over
suits to enforce the federal regulations in a delegated state because the federal regulations are no
longer effective. *See Chemical Weapons Working Group v. United States Dept. of the Army*, 990 F.
Supp. 1316, 1319 (D. Utah 1997);  *City of Heath v. Ashland Oil, Inc.*, 834 F. Supp. 971, 980 (S.D.

**IV.    Summary Judgment Is Due to Be Granted Because Plaintiffs Have Not Presented Sufficient Evidence of a Violation under 42 U.S.C. § 6972(a)(1)(A)**

The remaining counts of Plaintiffs' Second Amended Complaint allege that Defendants are in violation of various provisions of Alabama hazardous waste regulations.[7]  These claims are asserted pursuant to RCRA section 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), which provides that a citizen suit may be brought against any person who is alleged to be "in violation" of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective

_____

Ohio 1993).  With respect to the latter, courts have reached different conclusions.  *Compare Glazer v. American Ecology Environmental Services Corp.*, 894 F. Supp. 1029, 1040 (E.D. Texas 1995) (finding that a RCRA citizen suit may be brought in federal court to enforce state requirements); *Murray v. Bath Iron Works Corp.*, 867 F. Supp. 33, 43 (D. Maine 1994) (same); *and Sierra Club v. Chemical Handling Corp.*, 824 F. Supp. 195, 197 (D. Col. 1993)(same); *with Dague v. City of Burlington*, 732 F. Supp. 458, 465 (D. Vermont 1989) ("The regulatory requirements under RCRA are superseded by state regulations in those states having EPA authorization . . . . Therefore, a plaintiff seeking to challenge the operation of a hazardous waste site in an EPA authorized state may bring an action under state law, not federal law, or may seek revocation of the EPA's authorization; a direct action to enforce the RCRA permit requirement under § 6925(a) is not available.").

[7]    Plaintiffs filed their original Complaint on November 19, 2002, naming seven Defendants and presenting claims in six counts, one brought under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), four brought under RCRA, and one claiming a violation of the Equal Protection provisions of the United States Constitution.  On February 14, 2003, Plaintiffs filed their First Amended Complaint, containing six revised Counts and deleting two of the original Defendants: ADEM and its Director.  The Amended Complaint brought claims against only the Federal Defendants and Westinghouse.

By Order dated July 8, 2003, Judge Karon O. Bowdre (then presiding over this case) dismissed two of the RCRA claims (Counts 4 and 5) as impermissible collateral attacks on elements of the Alabama RCRA permit, and the equal protection claim (Count 6). Judge Bowdre declined to dismiss Counts 2 and 3 because, on the face of the pleading, those counts alleged current violations of RCRA and thus, could (if supported by substantial evidence) be actionable under 42 U.S.C. § 6972(a)(1)(A).

In filing their Second Amended Complaint, Plaintiffs voluntarily dismissed their NEPA claim because it is duplicative of a claim brought in the U.S. District Court for the District of Columbia. While the Second Amended Complaint originally contained the three Counts dismissed in the July 8 Opinion, the court granted leave to amend only as to Counts 1 and 2 (which correspond to Counts 2 and 3 of the original Complaint and First Amended Complaint).  Thus, the only claims remaining in the litigation are Counts 1 and 2 of the Second Amended Complaint.

pursuant to RCRA.[8]

In Count 1, Plaintiffs claim that Defendants are in violation of Alabama regulations that require the operator of a hazardous waste treatment facility to have a contingency plan (Ala. Admin. Code R. 335-14-5-.04), to inspect the facility in accordance with a written schedule (Ala. Admin. Code R. 335-14-5-.02(6)), and to design, construct, operate and maintain the facility to minimize the possibility of fire, explosion, or any unplanned release of hazardous waste to the environment (Ala. Admin. Code R. 335-14-5-.03(2)). In Count 2, Plaintiffs claim that Defendants are in violation of Alabama regulations that require the operator of a hazardous waste facility to obtain an analysis of a representative sample of the wastes before they are treated (Ala. Admin. Code R. 335-14-5-.02(4)) and to provide an analysis of the waste in the permit application or trial burn plan (Ala. Admin. Code R. 335-14-5-.15(2)).

It is undisputed that ANCDF has been issued a RCRA permit by the State of Alabama that specifically implements the inspection, monitoring, contingency plan, and sampling provisions of the Alabama regulations that form the basis of Plaintiffs' remaining allegations. In essence, the permit contains specific conditions (hereinafter "permit conditions") that address the general requirements of the Alabama regulations on which Plaintiffs rely. Plaintiffs do not dispute that all of the regulatory provisions on which their claims are based were addressed in the permitting process

---

[8]   Plaintiffs admitted at oral argument, and reiterate in their supplemental brief in opposition to summary judgment, that all of their remaining claims are alleged under § 6972(a)(1)(A). (Doc. # 88, at 4). The allegations contained in ¶¶ 32, 34, 35, 36, 37 of Plaintiffs' Second Amended Complaint allege potential, rather than existing, conditions. To the extent that Plaintiffs seek to assert future claims based upon potential violations that have not yet occurred, those claims are not ripe for consideration by this court. They are merely speculative and do not comply with the RCRA requirement that violations alleged be "current" violations. 42 U.S.C. § 6972(a).

and are implemented by specific permit conditions.[9]  (Hardy Depo. at 44-49).

It is important to note that Plaintiffs' Second Amended Complaint alleges only that Defendants have violated Alabama *regulatory provisions*.  The Second Amended Complaint does not allege that Defendants are in violation of the permit itself.  Nonetheless, Plaintiffs' claims have "morphed" through the summary judgment process to include that allegation, which they approach from two angles.  First, Plaintiffs argue that Defendants have violated the permit by failing to comply with the regulations because the general mandates of the Alabama regulations have been incorporated into the permit by reference and/or by restating the substantive requirements.  As explained below, the court finds that this argument is contrary to Alabama's "permit shield" provision.

Plaintiffs' opposition to summary judgment also articulates an alternative basis for their claim that Defendants are in violation of their permit.  Plaintiffs now claim that "new facts," which arose after the permitting process was complete, demonstrate ongoing permit violations by Defendants. Even assuming that this claim is properly in the case, the court finds this argument equally unpersuasive, as outlined in Section IV.D., *infra*.  First, however, the court will discuss the permit shield and its effect on Plaintiffs' arguments.

A.      **The Permit Shield Narrows the Relevant Question Before the Court**

Alabama RCRA regulations contain a "permit shield" provision which provides that compliance with a state hazardous waste permit constitutes compliance with the requirements of

---

[9]      Plaintiffs admit: "It is true that the permit issuance and appeal process addressed the requirements at issue in the instant complaint to some extent because the permit in fact imposes requirements for waste characterization, prevention and minimization of releases, and identification and quantification of releases – and does so by *inter alia* incorporating the regulations sought to be enforced by Plaintiffs here." (Doc. # 88, at 3).

RCRA.[10]  Ala. Admin. Code R. 335-14-8.01(4)(a).[11]  Under the permit shield, if all of Defendants' ANCDF activities are authorized by, and in compliance with, the permit, Defendants are in full compliance with RCRA as a matter of law and are entitled to summary judgment.

As noted earlier, Plaintiffs do not dispute that the Alabama regulations on which their claims are based are addressed and implemented through the permit conditions set forth in ANCDF's permit.  Rather, Plaintiffs maintain that they can enforce the underlying regulations directly, even if the permitting authority has determined that the permittee is in compliance with the permit. Plaintiffs' argument is dependent upon a finding that the Alabama permit shield provision is ineffective, and they offer the following reasons why this court should not apply the permit shield: (1) the holding in *Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1992), renders permit shield provisions applicable only to EPA and state enforcement actions, not citizen suits; and (2) the Alabama permit shield conflicts with, and therefore is trumped by, federal law because it serves to bar federal RCRA citizen suits.

The court finds that both of Plaintiffs' arguments are fundamentally flawed.  Plaintiffs' reliance on *Shell Oil* for the proposition that the applicability of permit shield provisions is limited to enforcement actions is misplaced. The D.C. Circuit specifically noted that the federal permit shield provision is applicable to citizen suits and does effectively "narrow the opportunities for citizen suits."  *Shell Oil*, 950 F.2d at 761-65; *see also Chemical Weapons Working Group, Inc. v.*

---

[10]    Although the regulation does provide some exceptions to this general rule, it is undisputed that those exceptions do not apply in this case.

[11]    This Alabama regulation reflects an analogous federal regulation.  40 C.F.R. § 270.4(a); *see Shell Oil Co. v. EPA*, 950 F.2d 741, 761-65 (D.C. Cir. 1992) (upholding federal "permit shield" provision).  ADEM's representative echoes the opinion that compliance with the terms of the permit constitutes compliance with RCRA regulatory provisions.  (Hardy Depo. at 44-46, 48-49).

16

*United States Dept. of the Army*, 111 F.3d 1485, 1492 & n. 5 (10th Cir. 1997) (rejecting claims made by some of the Plaintiffs in this case that the citizen suit provision authorizes suits for permitted activity). Nonetheless, that "narrowing" of citizen suit availability is not a complete bar to citizen suits, as Plaintiffs allege. Rather, RCRA creates the cause of action for citizens to remedy violations, while the permit shield regulation defines what constitutes a RCRA violation. Even under the permit shield, citizen suits are certainly readily available to remedy violations of a permit and other such scenarios. However, when a permittee is acting in compliance with a permit, which was duly crafted by the authorized state entity to ensure compliance with RCRA requirements, the permit shield provision protects that permittee from allegations that it is still violating RCRA. Such an interpretation of the permit shield provision is consistent with RCRA's intent for a federal-state partnership to regulate the disposal of solid and hazardous waste. Accordingly, the court finds that the Alabama permit shield does not conflict with RCRA and therefore operates in full force in this case.

Having determined that Plaintiffs' claims are governed by the Alabama permit shield provision (that provides that compliance with a permit constitutes compliance with the regulations), the only relevant question for the court to determine is whether the hazardous waste activities being conducted at ANCDF are authorized by, and in compliance with, the permit.[12] As explained below, the court finds the answer to be in the affirmative and therefore grants summary judgment for Defendants.

---

[12]    In light of the permit shield provision, Plaintiffs' first approach to their claim that Defendants are violating the permit is nonsensical. As noted earlier, Plaintiffs argue that because the regulations are incorporated into the permit, Defendants are in violation of the permit if they fail to comply generally with the regulations. In fact, the correct analysis is exactly the opposite. Under the permit shield  provision, if Defendants comply with the permit, they comply with the regulations.

**B.** **All of the Alleged Regulatory Violations of Count I Are Addressed and/or Authorized by the Permit**

In Count 1, Plaintiffs allege that Defendants have violated three general provisions of Alabama's regulations regarding contingency plans, facility inspections and design of the facility. (Second Amended Complaint ¶¶ 29-31). As outlined below, each of these provisions is addressed in detail in the ANCDF permit.

**1.** **Contingency plan**

Ala. Admin. Code R. 335-14-5-.04 requires that each hazardous waste facility have a contingency plan that describes how the facility operator will respond to an emergency situation such as fire, explosion, or unplanned release of hazardous waste. This requirement is implemented in condition II.H of the permit which requires the facility to follow the procedures contained in the Contingency Plan submitted to ADEM as part of the application and incorporated by ADEM into the permit. (Doc. # 57, Ex. 1, at 27). The permit also requires the facility to perform a staged shutdown of the facility in the event of fire or unplanned release and prohibits the facility from resuming operations until ADEM has been notified of the event and ADEM has given the facility approval to resume operations. (Doc. # 57, Ex. 1, at 27 (Permit conditions II.H.2, II.H.3); Ex. 6 at 2).

**2.** **Facility inspection**

Ala. Admin. Code R. 335-14-5-.02(6) requires that the operator of a hazardous waste facility inspect the facility in accordance with a written schedule. This provision is implemented by section II.E of the permit, which provides that the facility will comply with the relevant provisions of the Alabama regulations and with the specific Inspection Procedures and Schedules incorporated into

the permit.  (Doc. # 57, Ex. 1, at 25-26 (Permit condition II.E.1)).

### 3.    Design of Facility

Ala. Admin. Code 335-14-5-.03(2) requires that the facility be designed, constructed, operated, and maintained to minimize the possibility of fire, explosion, or any unplanned release of hazardous waste to the environment.  This provision is incorporated into the permit through permit condition II.A.1, and the permit also requires that the facility be constructed in accordance with the drawings approved by ADEM.  (Doc. # 57, Ex. 1, at 24 (Permit condition II.A.2)).  Moreover, the permit contains extensive provisions detailing how the facility must be operated and maintained in order to minimize the possibility of fire, explosion or unplanned release.  (Doc. # 57, Ex. 1, at 26, 96-152 (Permit conditions II.F (Training Plan) and II.G (Preparedness and Prevention), Permit Module VI (General Conditions for the Incinerators))).

With respect to the design of ANCDF, Plaintiffs contend that "the chemical warfare agent monitoring systems in use at the Army chemical weapons incineration sites are unreliable and have known defects." (Doc. # 65). Plaintiffs maintain that Defendants should have altered the design or operation of ANCDF so as to prevent the following problems that TOCDF has experienced: (1) incinerator ACAMS agent monitor stack alarms; (2) releases to the environment of chemical agent and agent incineration wastes from non-stack locations (fugitive releases); (3) chemical agent releases to the environment from the incinerator stack; (4) gelling and gumming of agent in the agent feed guns; and (5) incidents in which workers have been exposed to chemical warfare agent at levels causing signs and symptoms of exposure.[13]

_____

[13]    For example, Plaintiffs assert that, at TOCDF,  chemical agent has migrated to category C areas where agent is not supposed to be, where unprotected workers may be present, and which are often areas adjacent to the outside environment.  (Doc. # 64, Ex. 7 at 92-93, 122-23; Ex. 8 at 25-26;

Defendants point out that the TOCDF operational history was fully considered by ADEM in making its decision on the ANCDF permit.   (Doc. # 57, Ex. 7, Department of the Army Memorandum October 12, 2000, Enclosure 4 to Minutes of December 7, 2000 ANCDF/ADEM meeting).   Moreover, while the facility at TOCDF is similar to ANCDF, there are also significant differences in the design, construction, and operation of the two facilities, reflecting the fact that they were constructed at different times, are operated by different people, and have different mixes of munitions and other materials to be processed.    (Doc. # 64, Ex. 22 at 28, 29, 32, 122-25, 129-30, 223-25, 234-35).  Therefore, as noted by the court in footnote 3, *supra*,  the fact that an incident may have occurred at TOCDF is simply not evidence that Defendants are in violation of their permit or regulatory obligations at ANCDF.

### 4.    Monitoring of Emissions

Plaintiffs also allege that Defendants are not adequately monitoring emissions from the facility that might be released, but that have not been identified. (Second Amended Complaint ¶ 37). Plaintiffs claim that the fact that these unidentified compounds are not monitored means that the facility poses a threat to human health or the environment.  (Second Amended Complaint ¶¶ 32-38). The issue of what compounds should be monitored in the facility's emissions (and when) and what action should be taken as a result of any exceedances has been specifically addressed in the permit. (Hardy Depo. at 32-37, 46-48).   The permit contains specific emission limitations and monitoring requirements for each of the facility's incineration units during the shakedown, trial burn and post-trial burn periods as well as during normal operation.  (Doc. # 57, Ex. 1, at 102-79 (Permit conditions VI.B.1.ii-vii and VII.B.2.ii-vii (emission standards for the Liquid Incinerator), VI.B.4 and

Ex. 10 at 78-9; Ex. 11 at 81-82).

VII.B.5 (monitoring requirements for Liquid Incinerator), VI.C.1.ii-vii and VII.C.2.ii-vii (emission standards for the Metal Parts Furnace), VI.C.4 and VII.C.5 (monitoring requirements for the Metal Parts Furnace), VI.D.1.ii-vii and VII.D.2.ii-vii (emission standards for the Deactivation Furnace), VI.D.4 and VII.D.5 (monitoring requirements for the Deactivation Furnace))).

Moreover, the evidence shows that Plaintiffs' monitoring concerns were raised and specifically addressed in the permitting process.   Once again, Plaintiffs' claims are based on events that occurred at TOCDF, *e.g..,* ACAMS monitor alarms at TOCDF have been triggered by substances other than chemical agent.   (Second Amended Complaint ¶¶ 32-33).   Information concerning the alarms at TOCDF was submitted to ADEM during the permitting process.   (Doc. # 57, Ex. 7).   Among the information submitted to ADEM was an analysis of the false alarms at TOCDF, which determined that the alarms were caused by various interfering substances (many of which were identified) and that the problem was exacerbated by the sensitivity of the monitors. (Doc. # 57, Ex. 7, at 14-16, 18).   Thus, at the time the ANCDF permit was issued and then modified to allow agent operations, ADEM was fully aware that agent alarms had occurred at TOCDF, and that not all of the interfering substances had been identified.[14]   Armed with that information, ADEM constructed ANCDF's permit accordingly.

---

[14]   Plaintiffs' claim that Defendants do not adequately monitor the incinerator stack to assess whether they are in compliance with permit standards for mercury, lead, dioxins, or other hazardous wastes is not supported by the evidence. (Doc. # 75, at 4).   In support of this claim, Plaintiffs point to a February 4, 2004 incident when ANCDF workers who were involved in maintenance activities in a toxic area set off ACAMS alarms outside the toxic area. (Garrett Depo. at 61-64, 94-117, 126-29; Love Depo. at 35-45). The undisputed evidence shows that the permit requires the use of ACAMS devices for stack monitoring.   There is no evidence that Defendants have not used the ACAMS equipment for monitoring.   Rather, Plaintiffs believe that the ACAMS equipment is unreliable. This is simply an impermissible collateral attack on the adequacy of the permit, as discussed in Section V, *infra.*

The court finds that the determination of which contingency plans, facility inspections, facility design, and emissions monitoring are required to protect human health and the environment is delegated to ADEM, was specifically addressed in the permitting process, is governed by specific provisions in the facility's permit, and has been affirmed by the Alabama courts.

### C.     All of the Alleged Regulatory Violations of Count II Are Addressed and/or Authorized by the Permit

In Count 2, Plaintiffs challenge the adequacy of Defendants' analysis of the materials to be processed in the ANCDF.  Specifically, Plaintiffs allege that Defendants are in violation of Ala. Admin Code R. 335-14-5-.15(2), which requires that a person seeking a permit for a hazardous waste incinerator submit a trial burn plan that includes an analysis of the wastes to be burned, and Ala. Admin Code R. 335-14-5-.02(4), which requires the permittee to obtain an analysis of a representative sample of the wastes before they are treated.  The Alabama regulations provide that the sampling requirement of Ala. Admin Code R. 335-14-5-02(4)(a) is satisfied by following a waste sampling plan incorporated into the permit.  Ala. Admin Code  R. 335-14-5-02(4)(b).

Plaintiffs argue that Defendants are violating the above regulations because neither ADEM nor Defendants have performed actual chemical analyses of the chemical agent and weapons waste to be incinerated at ANCDF, but have relied instead on the analysis done at TOCDF and the Army's knowledge as waste generator of the chemical warfare agent manufacturing process.[15]  To the

---

[15]     Plaintiffs claim that certain determinations – based on results from TOCDF, not on actual chemical analyses of ANCDF waste – violate Alabama characterization requirements. For example, Plaintiffs point out that higher than anticipated levels of mercury and other toxic metals were discovered in the agent GB waste at TOCDF.  (Doc. # 57, Ex. 8 at 2-3; Doc. # 64, Ex. 8 at 6-7, 9, 13-15, 57, 63; Ex 11 at 71-73; Ex. 14 at 6).  However, based on results from TOCDF, ADEM has determined that those higher levels will not be present in ANCDF waste.  (Doc. # 57, Ex. 8 at 2-3). In fact, ANCDF does not have any GB bulk containers. (Doc. # 64, Ex. 22 at 209-10; Doc. # 57, Ex. 8 at 2-3).

contrary, the undisputed evidence demonstrates that Alabama's characterization requirements were specifically addressed in the ANCDF permit and that ADEM was fully aware of the Army's reliance on results from TOCDF. Moreover, Plaintiffs' argument ignores the undisputed fact that regulations expressly permit a generator to use its knowledge of its waste to characterize it in lieu of testing. (Doc. # 57, Ex. 2 at 39-40).[16]

### 1.    General Characterization and Sampling

In its permit application, the Army explained that the chemical agent-containing materials to be processed at ANCDF were products that had been manufactured to the Army's specifications and carefully controlled since manufacture. (Hardy Depo. at 39-40; Doc. # 57, Ex. 1, at Att. 2 at 1-2). The Army has extensive documentation of the manufacturing process for the materials to be processed at ANCDF. (*Id.*). The Army also has information from the sampling of munitions that occurred at TOCDF and the facility at Johnson Atoll. (*Id.*). Thus, the Army represented to ADEM that the materials to be incinerated at ANCDF have been well-characterized and that no further physical or chemical analysis was necessary. (*Id.*). The permit contains a waste analysis plan that specifies how the facility is to sample and analyze residues and other wastes to be generated during operation of the facility. (Doc. # 57, Ex. 1, at Att. 2).

------

[16]    Alabama regulations provide that the characteristics of hazardous waste may be "[r]easonably detected by generators of solid waste through their knowledge of their waste." Alabama Admin. Code R. 335-14-2-.02(1)(a)2(ii). The regulations further provide that the analysis of a representative sample of waste may include "existing published or documented data on the hazardous waste or on hazardous waste generated from similar processes." Alabama Admin. Code R. 355-14-5-.02(4)(a)(1); 355-14-5-.02(4)(a)(2). The waste analysis plan applicable in this case provides that "Chemical agents will not be sampled because sufficient information is available from chemical agent manufacture, manufacturing specifications, and previous studies conducted to date." (Doc. # 57, Ex. 1, at page 2 of Attachment 2).

Based on that information, ADEM developed estimates of the maximum amounts of metals and other constituents likely to be present in the munitions at ANCDF, and the emissions from incineration of materials containing these maximum amounts were tested during the required trial burns. (Hardy Depo. at 32-38; Doc. # 57, Ex. 8, at 2-7, 19, 21-24). The resulting emissions were then analyzed through a risk assessment to determine if they presented a risk to human health and the environment. (*Id.*).[17]

Accordingly, in issuing the permit, ADEM determined that the Army's characterization of the agent-containing materials was adequate. (Doc. # 57, Ex. 8, at 2-3). Plaintiffs challenged that determination administratively, and their claim was rejected by the Hearing Officer and the determination upheld by the Supreme Court of Alabama. *Families Concerned About Nerve Gas Incineration v. Alabama Dep't of Envtl. Mgmt*, Envtl. Mgmt. Comm'n Docket No. 97-17, Administrative Hearing Officer Findings of Fact, Conclusions of Law and Recommendations, at 270; *Alabama Dep't of Envtl. Mgmt., et al., v. Coosa River Basin Initiative, Inc.*, 826 So. 2d 111 (Ala. 2002). As noted above, ADEM also specifically included in the permit a waste analysis plan to characterize the residues from the incineration process and other wastes that will be generated during the incineration process.

---

[17]   Therefore, Plaintiffs' claim that Defendants have no knowledge of the level of mercury, lead, dioxins, and other materials being emitted from ANCDF is contrary to the undisputed evidence. (Doc. # 75, at 3-5). As noted above, potential emissions from ANCDF were thoroughly examined in the permitting process and actual emissions were measured during the trial burns. Because real time monitoring of dioxins, mercury, lead and other compounds is not practical, ADEM established final permit conditions in the form of feed rate limitations and incinerator operating conditions, based on the results of the trial burns and risk assessment, to ensure that the emission levels found acceptable in the risk assessment would not be exceeded during operation of the facility.

There is no basis for Plaintiffs' contention that Defendants do not know what levels of constituents are present in the munitions at ANCDF.

### 2. Formulation of a Plan to Combat Potential Analysis Problems Experienced at TOCDF

The undisputed evidence indicates that ADEM did not blindly adopt the protocol used at TOCDF, as Plaintiffs seem to suggest.  In fact, ADEM not only carefully considered any analysis problems encountered by TOCDF when formulating ANCDF's permit, but it also approved specific plans to deal with those potential issues.  For example, after Defendants informed ADEM that certain manufacturing lots of the nerve agent GB had been stabilized at TOCDF with a material that made the agent prone to gelling over time (Doc. # 57, Ex. 8, at Att. 1 at 3, Att. 2 at 3), a specific plan was developed and approved by ADEM to safely process munitions containing gelled agent at ANCDF. (Hardy Depo. at 40-43; Doc. # 57, Ex. 8 at 1-2, 17).

The court finds that ADEM has determined that the conditions contained in ANCDF's permit are adequate to protect human health and the environment.   Ala. Admin. Code R. 335-14-8-.03(a), (b); Doc. # 57, Ex. 8, at 22-23.[18]  Plaintiffs have had ample opportunity to challenge ADEM's action on the permit through the state administrative and judicial process, including review by the highest state courts in Alabama. This court will not revisit that issue. Accordingly, the court finds that the question of whether the munitions to be processed at ANCDF have been adequately characterized and analyzed was thoroughly addressed in the permitting process and sanctioned by ADEM.

---

[18]   The Federal Defendants also point out that, even if ADEM were to determine that the permit conditions were not adequate to protect human health or the environment or to otherwise comply with the Alabama regulations, ADEM can – and has– modified the permit to address new concerns. (Hardy Depo. at 44-46, 48-49).

**D.     Plaintiffs' Alleged "New Evidence" Is Not Sufficient to Show That Defendants Have Failed to Comply with the Permit**

In response to the Defendants' argument that all of Plaintiffs' claims were considered by ADEM during the permitting process and addressed by the permit, Plaintiffs argue that "new" facts, which arose after the permitting process was complete, demonstrate ongoing permit violations at ANCDF.  As noted earlier, this claim was not pled by Plaintiffs in the Second Amended Complaint. Plaintiffs have alleged only violations of Alabama regulations, not violations of the permit itself. Moreover, Plaintiffs' reliance on "new evidence" is fundamentally flawed because any fact that occurred too late to be considered in the permitting process also occurred too late to form the basis for the claims articulated in Plaintiffs' July 10, 2003 Second Amended Complaint.  Although the ANCDF permit was initially granted in 1997, that permit only allowed construction of the facility. Hazardous waste operations at the facility did not, and could not, begin until the permit was modified to approve the facility's agent trial burn plan.  That final approval of the permit did not occur until July 30, 2003.  (Doc. # 57, Ex. 4).[19]  Thus, any new facts that arose after the July 30, 2003 approval of the permit for hazardous waste operations occurred at least 20 days after Plaintiffs' Second Amended Complaint was filed and cannot form the basis for Plaintiffs' claims in this case.

Ironically, although Plaintiffs' complaint warns of the "imminent harm" that could result from Defendants' activities at ANCDF, not a single one of the Plaintiffs challenged the most recent permit decision by ADEM in July-August 2003 – the modification which allowed trial burns of

---

[19]     Moreover, the permit has been modified several times since hazardous waste operations began to reflect the experience that has been gained through operation of the facility. (*E.g.,* Permit Modification No. 20, December 9, 2004).  Each time the permit has undergone a major modification, the public has been given notice and an opportunity to comment prior to approval of the modification by ADEM.

actual agent (and which is the modification under which current operations are governed). A decision by ADEM to modify a permit is subject to challenge by *any* affected person in the same manner as the initial permit decision. Ala. Code § 22-22A-7(c) (1975). Each time the permit has undergone a major modification, the public has been given notice and an opportunity to comment prior to ADEM approval of the modification. Nonetheless, Plaintiffs did not pursue administrative review, nor bring to ADEM's attention, any of their "new" evidence concerns.

At oral argument, Plaintiffs indicated that they chose to pursue a citizen suit against Defendants rather than approaching ADEM about the most recent "evidence" of potential violations. Plaintiffs characterized the issue of violations at ANCDF as an enforcement decision by ADEM (Tr. at 145), suggesting at least by inference that ADEM has simply chosen not to pursue recent violations at ANCDF. Hardy's deposition testimony refutes Plaintiffs' effort to make this appear to be an exercise of enforcement discretion involving actual violations that ADEM has ignored. Hardy testified that there were no violations of the regulatory provisions that Plaintiffs seek to enforce in this case,[20] not that ADEM had decided not to pursue possible violations. Moreover, the fact that ADEM recently issued a "Notice of Violation" to ANCDF – albeit unrelated to Plaintiffs'

---

[20]    At his deposition, Hardy testified that Defendants are in compliance with all applicable Alabama RCRA requirements alleged by Plaintiffs in this case: (1) Defendants have not violated the applicable regulatory requirements of ADEM Admin. Code R. 335-14-5-.04 related to contingency planning and emergency procedures (Hardy Depo. pp 53-54); (2) Defendants have changed and added procedures as requested by ADEM, and are not currently in violation of  the applicable regulatory requirements of ADEM Admin. Code R. 335-14-5-.02(6) related to conducting regular inspections (Hardy Depo. pp 54-57); (3) Defendants have not violated the applicable regulatory requirements of ADEM Admin. Code R. 335-14-5-.03(2) related to preparedness and prevention, or design and operation of the incinerator (Hardy Depo. at 57); (4) Defendants have not violated any applicable Alabama RCRA regulatory requirements that they act to prevent and minimize emissions of hazardous wastes and their constituents (*Id*.); and (5) Defendants have not violated any applicable Alabama RCRA regulatory requirements to establish a plan to identify and quantify chemical releases, assess the hazards posed, and mitigate those hazards (Hardy Depo. at 58).

claims in this case, as outlined in Section IV.E., *infra* – deflates Plaintiffs' inference of non-enforcement by ADEM.

In any event, the court finds that Plaintiffs have failed to present evidence to establish that Defendants are violating the ANCDF permit.  At the February 15, 2005 oral argument, Plaintiffs articulated the following "new" evidence which they allege demonstrates a permit violation: (1) there have been, or will be, agent releases from the heated discharge conveyor bin area (Tr. at 93-98; 102-104; 107-124); (2) combustion of agent on the DFS feed chute has occurred and that agent material builds up on the chute (Tr. at 28); (3) Defendants failed to anticipate high levels of mercury and other metals in the waste, and failed to sample or test the munitions (Tr. at 16-18; 21-25; 71-78; 80-82; 126-38; 141-47); and (4) Defendants have failed to anticipate the presence of gelled or solidified agent wastes in some of the munitions and did not test the munitions or waste to determine the extent of the problem (Tr. at16-18; 21-25; 28; 138-47).  The court will address each claim in turn.

### 1.    Agent Releases from the Heated Discharge Conveyor Bin Area

Plaintiffs allege that the detection of low levels of agent in the heated discharge conveyer bin enclosure demonstrates that Defendants are not taking sufficient action to prevent the release of hazardous waste.  (Doc. # 75, at 4 (*relying on* Garrett Depo. at 164 - 165; Love Depo. at 82-101); Tr. at 89-90).  Plaintiffs have inferred that agent detection in the DFS heated discharge conveyor bin enclosure area means that chemical agent has been released into the environment.  (Doc. # 65, at 2-3).  Plaintiffs' argument fails for two reasons.  First, Plaintiffs' Second Amended Complaint does not contain this claim.[21]  Second, Plaintiffs' only "evidence" of a release is their belief that, because

---

[21]    Plaintiffs' claim in this case is that Defendants have failed to characterize potential emissions of chemicals, other than chemical warfare agent (Second Amended Complaint ¶ 37), from ANCDF's *stack.*  (Second Amended Complaint ¶¶ 32-37).  Plaintiffs now allege that an emission of chemical

chemical agent has been detected twice in an enclosed room that is part of the protected area inspected daily, a release can or has occurred every time the door to the bin is opened for daily inspection.  (Tr. at 95, 97).[22]

Detection of agent in the bin enclosure is not a permit violation.  Rather, the permit requires that ANCDF monitor the area and adhere to its procedures to minimize the risk of a release which could threaten human health or the environment.  (Doc. # 57, Ex. 1, at 24 of 241 (Permit Condition II.A.1)).  The evidence indicates that the heated discharge conveyer bin is in an area where air flow is controlled and constantly monitored for the presence of agent. (Garrett Depo. at 162-64; Love Depo., at 76-89).  Plaintiffs specifically admitted to the Court that the Plaintiffs do not know of any release of agent from this bin at ANCDF "to date" (Tr. at 96, 102, 104),[23] and there is no evidence that the presence of agent in the bin enclosure caused a release of agent into a non-controlled area or resulted in a permit violation or Alabama RCRA violation related to waste characterization and the Contingency Plan.

To the contrary, the evidence demonstrates that Defendants are complying with the permit and that the detection of chemical agent in the bin enclosure was investigated and addressed.  (Doc. # 64, Ex. 23 at 82-91; Ex. 22 at 171-75, 223-24).  In May 2004, ADEM modified the permit to

---

warfare agent with fugitive dust has occurred from the DFS *bin enclosure* at TOCDF and that chemical agent has been detected on two occasions in the DFS *bin enclosure* at ANCDF.  These facts are completely unrelated to Plaintiffs' claim that ANCDF has not adequately characterized potential emissions of non-agent chemicals from the facility's stack.

[22]    Plaintiffs also asserted that dust in the bin contains agent and is released in a plume every time the door is opened.  (Tr. at 102).

[23]    Approximately, ten to fifteen agent alarms have been triggered in heated discharge conveyor bin enclosure, but none were confirmed for the detection of agent.  (Garrett Depo. at 166-67).

implement specific procedures for ANCDF to follow when chemical agent is detected in the DFS

bin enclosure during both future agent trial burns and normal operations.  (Permit Modification 17,

conditions VI.D.3.x - xi (revised pages 28-29 of Module VI), conditions VII.D.4.ix - x (revised pages

25-26 of Module VII)).  The permit modification also required that the facility be modified so that

agent feed to the DFS is immediately stopped if the alarm in the DFS bin enclosure area is triggered.

(Permit Modification 2 to 3 (noting modifications to Module VI, Table 6-11 and Module VII, Table

7-6)).

      The fact that agent was detected on two occasions in the conveyer bin enclosure area at levels

below the allowable discharge provides no basis to question ADEM's determination that ANCDF's

permit is adequate to satisfy regulatory requirements.

      **2.**      **Combustion of Agent on the DFS Feed Chute**

      Plaintiffs next allege the following regarding the deactivation furnace system ("DFS") feed

chute (the location at which munitions are fed into the furnace): (1) a recent jamming of the feed

chute at ANCDF signals a potential problem because the jamming of the feed chute at TOCDF was

one of the contributing factors to the TOCDF May 2000 agent stack release (Doc. # 64, Ex. 16 at 2-4,

Ex. 20); (2) "ANCDF is prematurely incinerating munitions in the DFS feed chute. . . . Emissions

from this process are not controlled or properly regulated" (Doc. # 65, at 2, *relying on* Garrett Depo.

at 37); and (3) ANCDF has experienced accumulations of ash, fiberglass pieces and pieces of

munition bodies in the DFS feed chute kicker plate area (Garrett Depo. at 33 - 34), which Plaintiffs

claim is a regulatory or permit violation. (Tr. at 28).   Plaintiffs' arguments are not relevant to their

claims in this case that ANCDF is not adequately monitoring for compounds other than chemical

agent and that wastes were not adequately characterized.  Plaintiffs provide no explanation of how

the operation of the DFS is related to those claims.

Moreover, even assuming these events are relevant to Plaintiffs' claims, they do not demonstrate that ANCDF is in violation of its permit. The design, performance standards, and operating requirements for the DFS are set forth in the permit. The permit specifically allows combustion to incur in the DFS (Doc. # 57, Ex. 1 at 153), and the feed chute is part of that system. (Garrett Depo., at 48-53). ANCDF was designed so that any gases generated during combustion in the feed chute are directed into the furnace and the air pollution control system. (Doc. # 64, Ex. 22 at 45-46). Ash accumulates at the point where munitions are fed into the DFS incinerator because there is a great change in temperature. (Garrett Depo., at 37- 39). There is no evidence that this causes emissions from ANCDF,[24] or that it results in any violation of the permit or regulations alleged in this case. Moreover, both the design of the feed chute and adjustments to that design made in response to problems that had occurred at TOCDF were specifically addressed in the permitting process. (Doc. # 57, Ex. 8 at 34).[25]

### 3.   High Levels of Mercury and Other Metals in the Waste and Failure to Sample or Test Munitions

Plaintiffs also argue that there is a "problem with mercury emissions" from ANCDF, because Defendants do not continually sample for mercury emissions. (Doc. # 65, at 3; Doc. # 75, at 2). Plaintiffs point out that mercury has been detected in GB and mustard agent at ANCDF (Garrett

---

[24]   Despite an extension of the discovery period to allow Plaintiffs to pursue discovery on this issue (among others), Plaintiffs have not produced any evidence to suggest that there have been releases of chemical agent. (Garrett Depo., at 162-75; Love Depo., at 76-106, 161-64).

[25]   Furthermore, the permit has been modified several times since hazardous waste operations began, and several of those modifications have occurred since the build-up of material on the DFS feed chute was observed at ANCDF. Thus, even if this build-up was not anticipated when the permit was originally issued, it was known when the permit was modified.

31

Depo. at 182, 185), and they allege that Defendants "don't know how much mercury is in the waste, they don't know how much mercury comes out of the stack, and they don't have any reliable method of capturing the mercury." (Doc. # 75, at 2).

Contrary to Plaintiffs' argument, mercury was specifically identified as a waste expected to be present in incineration through the listing of waste Code D009 in the permit application. (Doc. # 62, Ex. 1, at 2140; ADEM Admin. Code R. 335-14-2-.03(5) Table 1). Moreover, the permit does not require ANCDF to conduct continual sampling for mercury. (Hardy Depo., at 62-70). Rather, the permit required ANCDF to sample waste for mercury in the surrogate trial burns and to operate the facility within the established parameters. (Love Depo., at 150-51). There is no dispute that potential metal emissions from the facility, including mercury, were tested during the surrogate trial burn and analyzed through risk assessment. (Hardy Depo. at 43-44; Doc. # 57, Ex. 8, at 5; Love Depo., at 150-51). Plaintiffs offer no evidence that mercury or other metal emissions exceed what is allowed by the permit.[26]

Although Plaintiffs point out that no regulation prevents Defendants from sampling for mercury, this argument carries no weight. That sampling is not prohibited does not meant that Defendants have an obligation to sample. Moreover, Plaintiffs' argument ignores the option to use generator knowledge (rather than sampling) – an option that the Hearing Officer ultimately recommended in view of the danger presented if each munition were tested:

> Regarding waste sampling, no regulation mandates sampling as the sole means of waste identification and determination. (Although the Plaintiffs' allege that the

---

[26] With respect to possible contamination by Lewisite (Second Amended Complaint at ¶ 44), ADEM considered the issue and determined that, because there are no bulk containers of GB in the inventory at ANCDF, the problem encountered at TOCDF is unlikely to arise at ANCDF. (Doc. # 57, Ex. 8, at 2-3).

Army and Westinghouse have not sampled and analyzed all wastes, they cite no regulation requiring such action).  In the administrative proceeding, it was established that sampling is one of two methods a generator of hazardous waste may use in making a waste determination, with the alternative being that the generator (here the Army) can apply its knowledge of the materials or the processes that generated the wastes.

(Doc. # 62, Ex. 1 at 621, Conclusion of Law 1, citing ADEM Admin. Code R. 335-14-2-.02(1)(a)2.(ii)).[27]   ADEM approved not tapping and sampling the munitions to avoid the risk to workers and the public.  (Hardy Depo., at 39-40).  Plaintiffs simply disagree with the permit provisions and the decision of the Commission to adopt the Hearing Officer's Recommendations in this regard.  But Plaintiffs' disagreement does not even hint at a permit violation and further, their mere disagreement cuts no ice at all in light of the permit shield provision.

### 4.    Failure to anticipate gelled or solidified agent wastes in munitions

Finally, Plaintiffs point out that, during operations at TOCDF, some of the munitions contained gelled agent while bulk agent lots contained higher levels of contaminants than initially projected.  (Second Amended Complaint ¶ 41).  As noted before, this information was provided to ADEM during the permitting process and ADEM specifically determined that the munitions to be processed at ANCDF had been adequately characterized.  (Hardy Depo. at 39-40; Doc. # 57, Ex. 8, at 2-3, 8-17).

---

[27]    As noted earlier, the evidence at the administrative hearing showed that the nature of the chemical weapons would make the sampling of each container or individual munition too dangerous for the benefit that might be derived, particularly when the generator has knowledge of the materials likely to be present in the chemical weapons.  (Doc. # 62, Ex. 2, at 3928).  Based on that testimony, the Commission adopted the Hearing Officer's determination that ADEM has the discretion under ADEM Admin. Code R. 335-14-8-.02(1)(c) to approve the Army's use of "generator knowledge" and relevant information to characterize the waste without sampling each individual weapon or munition.  (Doc. # 62, Ex. 1 at 539; at 619-20 ¶¶ 6-10; at 621-22, Conclusions of Law 1, 4 & 5).

ADEM was informed in October 2000 that the munitions to be processed at ANCDF could contain gelled or crystalline agent.  (Doc. # 57, Ex. 8, at 8).  This fact was considered in detail by ADEM before it allowed both the surrogate trial burn and the agent trial burn.  (Doc. # 57,. Ex. 6 at Att. at 3, Att. 2 at. 2, 12; Doc. # 57, Ex. 8 at 1-2, 8-21).  In fact, ANCDF was required to conduct a separate trial burn specifically tailored to address the issue of weapons that could not be drained because of the presence of gelled or crystallized agent.  (Doc. # 64, Ex. 22 at 276-78; Garrett Dec., at ¶¶ 38, 39; Doc. # 57, Ex. 8 at 6).  Furthermore, the waste analysis plan submitted to ADEM, and incorporated into the permit, stated that "[t]he ANAD inventory of munitions contains chemical agents in three forms (liquid, gelled, or crystallized), due to stabilization chemicals added to specific lots during production or storage."  (Doc. # 57, Ex. 1, Attachment 2, at 1-2).  The undisputed evidence shows that ADEM, with knowledge that the munitions to be processed at ANCDF could contain gelled or crystalline agent, specifically determined that any additional information that might be gained from physical testing of the munitions at ANCDF would not be worth the risk of a release associated with sampling these weapons.  (Hardy Depo. at 39-40).  Accordingly, Plaintiffs have not shown that Defendants are in violation of the permit by failing to anticipate or manage gelled or solidified agent wastes.

### E.    The August 26, 2004 Notice of Violation Is Not Probative of  Plaintiffs' Claims

At the February 15 hearing, Plaintiffs also referred to an August 26, 2004 Notice of Violation ("NOV") issued by ADEM to ANCDF.  (Doc. # 87, Ex. 3).[28]  The NOV identified nine violations

---

[28]    At the hearing, Plaintiffs stated they felt an "obligation" to raise the issue of the NOV (Tr. at 86), although Plaintiffs did not speak with conviction about its application to the claims in this case (Tr. at 86-88).  The parties were given an opportunity to address the NOV and its potential application to this case in their supplemental briefs filed one week after the February 15,  2005 hearing.

of the ANCDF permit that were either observed by ADEM inspectors or reported to ADEM by ANCDF during the period April 4, 2004 to June 22, 2004.  Defendants have offered the NOV as summary judgment evidence and do not object to the admission of the NOV.  (Doc. # 87, Ex. 3). Therefore the court will consider it as part of the summary judgment record.[29]

Defendants argue that the NOV is not relevant to Plaintiffs' claims in this case because events that occurred in 2004 cannot establish that ANCDF was in violation of the permit when the complaint was filed in 2002 or amended in 2003.  Defendants also maintain that the issues raised in the NOV are in the process of being resolved by an administrative order on consent that currently is being considered for public comment. (Doc. # 87, Ex. 4; s*ee also* http://www.adem.state.al.us/ PublicNotice/Jan/AO/ 1USArmy.htm).

Plaintiffs argue that the NOV proves that ADEM has concluded that Defendants are not in full compliance with either the permit requirements or the applicable regulations.  Nonetheless, Plaintiffs admit that the August 2004 NOV "does not address most of the violations alleged in the Plaintiffs' second amended complaint . . . . Item 9 concerns Plaintiffs' claim regarding the regulatory and permit violation of failure to prevent and minimize releases from the DFS HDC bin in substance, although it cites only to one specific permit requirement regarding the waste feed cut off procedure." (Doc.. # 88).

The court finds that the August 2004 NOV is not relevant to, nor probative of, Plaintiffs' claims in this case.  Plaintiffs admit that only one of the items identified in the NOV bears any

---

[29]   Plaintiffs's supplemental brief in opposition to summary judgment references "two or three" notices of violation and now claims that Plaintiffs "have had no opportunity for discovery regarding these documents." (Doc. # 88). Plaintiffs did not file a Rule 56(f) affidavit, nor do they appear to seek additional discovery of these items in lieu of a summary judgment ruling. Accordingly, only the August 26, 2004 Notice of Violation is part of the summary judgment record.

relationship at all to their claims – Item No. 9 which addresses ANCDF's report to ADEM that, as of July 29, 2004, the ACAMS monitoring device in the deactivation furnace system heated discharge conveyer bin enclosure was not being managed as an automatic waste feed cutoff as required by the permit modification of May 25, 2004.[30]    This item is not probative of Plaintiffs' claim that Defendants are in violation of their permit obligation to prevent and minimize releases from the DFS heated discharge conveyer bin.   That the ACAMS monitoring device in the DFS was not being managed as an automatic waste feed cutoff does not prove that Defendants have released, or failed to prevent the release of, hazardous waste into the environment.   The permit imposes specific operational requirements to minimize releases from the bin enclosure, including a requirement to cease waste feed if there is an alarm from the ACAMS.   (Doc. # 87, Ex. 2, at 28-29 of Module VI, 25-26 of Module VII).  There is no evidence that Defendants have not complied with those requirements.   The August 2004 NOV is not sufficient to demonstrate a permit violation related to Plaintiffs' claims in this case.

Accordingly, for all of the reasons articulated above, the court finds that summary judgment for Defendants is due to be granted on the merits of Plaintiffs' claims.  The undisputed evidence demonstrates that all of the regulatory provisions on which Plaintiffs rely, and the concerns which Plaintiffs have articulated, were addressed by the permitting process.  Moreover, there is no evidence that Defendants have violated the permit conditions as set forth by ADEM.  Because Plaintiffs'

---

[30]    Items 1 and 2 concern how long the confirmatory DAAMS tubes should be run before they are sampled.  Item 3 concerns ADEM's finding that a bin that was being managed as empty had not been completely empty.  Item 4 concerns an event when incompatible acidic and caustic wastes were present on the same pallet.  Items 5, 6, and 7 are related to the management of the liquid from the air pollution control system.   Item 8 concerns two events in which the calibration process for monitoring instruments had not been fully completed before hazardous waste operations began. None of these items are related in any way to Plaintiffs' claims in this case.

claims are governed by the Alabama permit shield provision (that provides that compliance with a permit constitutes compliance with the regulations), summary judgment is due to be granted because all of the hazardous waste activities being conducted at ANCDF are authorized by, and in compliance with, the permit.

## V.     Summary Judgment Is Due to Be Granted Because Plaintiffs' Claims Are Impermissible Collateral Challenges to the Permit

Alternatively, the court finds that summary judgment is due to be granted because Plaintiffs' claims constitute a collateral challenge to the permit, which falls outside of the court's jurisdiction and regardless, is subject to *res judicata*.

It is clear from Plaintiffs' opposition to summary judgment that Plaintiffs seek to collaterally attack ADEM's decisions about how to implement Alabama's regulations through specific conditions in the permit. As noted throughout this opinion, ANCDF's permit addresses all of the regulatory provisions that Plaintiffs allege have been violated and sets forth specific conditions to ensure ANCDF complies with those regulations. All of the Plaintiffs' evidence concerning events or potential events they deem objectionable have been addressed by the permit – Plaintiffs simply disagree with the adequacy of the permit to prevent or manage those events.

The timing of Plaintiffs' complaint likewise indicates that it is nothing more than a collateral attack on the adequacy of the permit. Although Plaintiffs' complaint was filed in November 2002 and amended for the second time in July 2003 (Docs. # 1, 41, 47), hazardous waste operations at ANCDF did not begin until August 2003, at least one month after the last complaint amendment. (Doc. # 57, Ex. 3 at ¶ 39). Thus, the Second Amended Complaint – which alleged in July 2003 that Defendants were currently violating Alabama regulations – was filed before hazardous waste

operations began at ANCDF. Therefore, Plaintiffs can only be asserting that, even if Defendants operate ANCDF in full compliance with the permit conditions, Defendants will still fail to comply with the Alabama regulatory provisions cited by Plaintiffs. This is a collateral attack on the adequacy of the permit to address the regulatory requirements.

Notwithstanding this tautological reasoning, Plaintiffs maintain that their remaining claims are not a collateral attack on the permit conditions, but rather an attempt to enforce the regulatory provisions which are incorporated by reference into the permit. Plaintiffs point out that, consistent with the citizen suit provision, they have alleged a violation of a statute, regulation, or permit requirement and seek to enforce the violation by the operator of the hazardous waste facility – they have not alleged that the permit is inadequate nor brought an action against the permitting authority. (Doc. # 88, at 2). The court finds this semantic difference unpersuasive. The essence of Plaintiffs' claims in this case is that, even if ANCDF were operated in full compliance with the permit conditions established by ADEM, Defendants would still be in violation of the regulations. The only explanation for such a scenario is that the permit is inadequate to fulfill the regulation requirements.

## A.    The Court Lacks Jurisdiction to Consider Collateral Permit Challenges

Therefore, to the extent that Plaintiffs have asked this court to review ADEM's findings that the permit adequately implements Alabama regulations, such a claim falls outside this court's jurisdiction. Challenges to the adequacy of the state-issued permit are committed to the state administrative and judicial process, and, as noted in Judge Bowdre's July 8, 2003 Memorandum Opinion (Doc. # 39), this court has no jurisdiction to hear collateral challenges to the facility's permit. 42 U.S.C. § 6972(b)(2)(D); *Chemical Weapons Working Group, Inc. v. United States Dept. of the Army*, 111 F.3d 1485, 1492 (10th Cir. 1997); *Coalition for Health Concern v. LWD, Inc.,* 60

F.3d 1188, 1192-93 (6th Cir. 1995); *Palumbo v. Waste Technologies Indus.*, 989 F.2d 156, 160-61 (4th Cir. 1993); *Greenpeace Inc. v. Waste Technologies Indus.*, 9 F.3d 1174, 1181-82 (6th Cir. 1993).

RCRA's regulatory scheme delegates implementation of the RCRA permit program, including judicial review of the issuance of those permits, to the states. 42 U.S.C. §§ 6926(b) (state program operates in lieu of federal program), 6926(d) (permit issued by state has same force and effect as one issued by EPA). Plaintiffs had ample opportunity to seek judicial review of the ADEM permit, and its modifications, in the Alabama state courts. To the extent they availed themselves of that opportunity, they were unsuccessful.

The process of obtaining the ANCDF permit was a lengthy one, involving numerous exchanges and meetings between the permittees and ADEM. (Hardy Depo. at 9-22). After a public notice and comment period, ANCDF received a hazardous waste permit from ADEM on June 19, 1997. (Hardy Depo. at 9-22). As outlined in detail in Section II.C-D *supra*, the permit was challenged in state administrative and judicial fora by several of the Plaintiffs, and was ultimately affirmed by the Alabama Supreme Court. *See Families Concerned About Nerve Gas Incineration v. Alabama Dep't of Envtl. Mgmt*, Envtl. Mgmt. Comm'n Docket No. 97-17, Administrative Hearing Officer Findings of Fact, Conclusions of Law and Recommendations; *Alabama Dep't of Envtl. Mgmt., et al., v. Coosa River Basin Initiative, Inc.*, 826 So. 2d 111 (Ala. 2002). The permit has subsequently been amended several times by ADEM. (Doc. # 57, Ex. 1 at vi; Hardy Depo. at 25-28). The permit, as amended, contains an inspection plan, a contingency plan, a waste analysis plan, and extensive air emissions monitoring requirements. (Doc. # 57, Ex. 1 at 25-27, 96-217).

Moreover, before it began agent operations, ANCDF also had to undergo a series of trial burns, the first of which involved surrogate compounds that tested the facility's ability to operate properly and to destroy chemical agents.  (Hardy Depo. at 27-29).  Before the facility could move to the next stage, which is a trial burn involving actual chemical agent containing munitions, ADEM had to approve ANCDF's report on the surrogate trial burns and ANCDF's agent trial burn plan. (Hardy Depo. at 29-39).  Surrogate trial burns were completed in 2002, and ANCDF submitted the results to ADEM in addition to agent trial burn plan to ADEM as a modification of the permit. ADEM approved the agent trial burn plan as a major modification of the permit on July 30, 2003. (Doc. # 57, Ex. 4).

Aside from the initial challenge to the permit, Plaintiffs have not sought either administrative or state judicial review of ADEM's recent permit modification, which is the modification under which current operations are governed.  Although Plaintiffs did seek a temporary restraining order from the U.S. District Court for the District of Columbia in the context of litigation pending in that court concerning the Army's compliance with NEPA, that request was denied on August 8, 2003. Agent operations began at the facility on August 9, 2003, with the startup of the shakedown process for M55 rockets containing the nerve agent GB.  (Garrett Decl.  ¶ 39).

Because the question of whether ANCDF's permit properly implements Alabama RCRA regulations has already been determined by ADEM and the Alabama courts and is not subject to review in the context of this RCRA citizen suit, this court cannot -- and will not -- second-guess ADEM's chosen application of the Alabama regulations to ANCDF's permit.   Accordingly, summary judgment is due to be granted for this reason alone.

**B.      Plaintiffs' Claims Are Barred by the Doctrine of Res Judicata**

"[T]he doctrine of res judicata prohibits the relitigation of all matter which was or could have been litigated in the prior action." *Century 21 Properties, Inc. v. Alabama Real Estate Comm'n*, 401 So. 2d 764, 768 (Ala. 1981). In determining whether a judgment from Alabama will have preclusive effect in an action pending in another state or federal court, the other court must apply the *res judicata* and collateral estoppel rules of Alabama. *See Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 520 (1986). "Under Alabama law, the essential elements of *res judicata* are: '(1) a prior judgment on the merits, (2) rendered by a court of competent jurisdiction, (3) with substantial identity of the parties, and (4) with the same cause of action presented in both suits.'" *National Association for the Advancement of Colored People v. Hunt*, 891 F.2d 1555, 1560 (11th Cir. 1990) (citations omitted). Elements one and two clearly are satisfied by the findings of the Commission Hearing Officer and the state court judgments affirming those findings. (Doc. # 62, Ex. 1, Recommendation of Hearing Officer); *Families Concerned about Nerve Gas Incineration v. ADEM*, 826 So. 2d 857 (Ala. Civ. App. 2002); *Ala. Dep't of Envtl. Mgmt. v. Coosa River Basin Initiative, Inc.*, 826 So. 2d 111, 116 (2002). Accordingly, the court limits its discussion to the third and fourth elements enumerated above.

**1.      Identity of the Parties is Satisfied in this Case**

Element number three, the "identity of the parties" requirement, is also satisfied in this case. "Identity of the parties concerns two sets of persons. The first set is compromised of those persons who were actual parties in the original action…The second set…is composed of those persons who are or were in privity with the parties to the original suit." *NAACP*, 891 F.2d at 1560 (11th Cir. 1990) (citations omitted).

As noted earlier, Families and SAFE were the only Plaintiffs who actually participated in the state court litigation. However, under the doctrine of privity, the other Plaintiffs who have brought this lawsuit may also be bound by the previous decision. Under Alabama law, "[j]udgments can bind persons not party (or privy) to the litigation in question where the nonparties' interests were adequately represented by a party in the original suit." *See Century 21*, 401 So.2d at 770. "Privity is defined as 'a relationship between one who is a party of record and a nonparty that is sufficiently close so a judgment for or against the party should bind or protect the nonparty." *NAACP*, 891 F.2d at 1555. "Privity also exists where a party to the original suit is 'so closely aligned to a nonparty's interest as to be his virtual representative.'" *NAACP*, 891 F.2d at 1555 (citations omitted).[31] "The question of whether sufficient privity exists to warrant application of *res judicata* is a question of law." *NAACP*, 891 F.2d at 1561 (11th Cir. 1990).

The court finds that the remaining Plaintiffs in this case are all in privity with Families and SAFE, who virtually represented those Plaintiffs in the previous litigation given their alignment of interests. *See Jaffree v. Wallace*, 837 F.2d 1461, 1466 (11th Cir. 1988) ("[T]he doctrine of 'virtual representation,'… supports a finding of privity 'when the respective interests are closely aligned and the party to the prior litigation adequately represented those interests."); *see also Century 21*, 401

---

[31]   In *NAACP*, the Eleventh Circuit affirmed a summary judgment for the defendants, holding that the plaintiffs' claims were barred by *res judicata*. *NAACP*, 891 F.2d at 1561. In previous litigation, a state legislator brought several claims against the manner in which flags were flown at the Alabama State Capitol. *NAACP*, 891 F.2d at 1559-60. In the subsequent litigation, the NAACP brought claims against the same conduct. *NAACP*, 891 F.2d at 1559-60. The plaintiff in the original litigation was also a member of the NAACP. *NAACP*, 891 F.2d at 1561. Reasoning that the plaintiff in the original litigation "was so closely aligned to the NAACP's interests in the original suit that he was their virtual representative" and that subtle distinctions in the requested relief were "tenuous at best," the court held that their interests were deemed to be sufficiently aligned for *res judicata* purposes. *NAACP*, 891 F.2d at 1561.

So.2d at 770 ("A person may be bound by a judgment even though not a party to a suit if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative.").

In *Families Concerned about Nerve Gas Incineration v. ADEM*, 826 So. 2d 857 (Ala. Civ. App. 2002), the Alabama Court of Civil Appeals stated that Plaintiffs-Appellants "Families and SAFE are public-interest citizen groups with members from Calhoun County and other locations in the State organized to ensure that the incineration of the chemical agents at Anniston Army Depot is accomplished in a manner that protects human health, safety, and the environment." *Families*, 826 So.2d at 860.  Likewise, all of the Plaintiffs in this case have an interest in enjoining the operation of ANCDF because they are concerned that a release of harmful substances into the environment could ultimately adversely affect their members.  (Second Amended Complaint, ¶¶ 5-16).[32]  All Plaintiffs in this case have members that live in an area subject to the allegedly adverse effects of Defendants' actions.  (Second Amended Complaint, ¶¶ 5-16).  It is clear that all of the Plaintiffs in this litigation seek to protect the same interests that Families and SAFE sought to protect in the permit appeals, and therefore, identity of the parties is satisfied.

### 2.     The "Same Cause of Action" Requirement Is Satisfied in this Case

"This Circuit has recognized that 'the principal test for comparing causes of action is whether

---

[32]     Indeed, language used to allege the threat of harm is virtually identical for every Plaintiff:

> Each of the violations referenced in this Complaint in the counts that follow will result in additional risk of release, and/or additional actual releases, into the environment and work place of toxic pollutants including nerve and blister agents, heavy metals, PCBs and Dioxin-Like compounds.  These releases will harm Plaintiff['s] members via contamination of the air, water, land and food sources used by these Plaintiffs.

(Second Amended Complaint, ¶¶ 5-16).

the primary right and duty or wrong are the same in each action.' *Res judicata* applies not only to the precise legal theory presented in the prior case, but to all legal theories and claims arising out of the same nucleus of operative fact." *NAACP*, 891 F.2d at 1561 (citations omitted); *see also Century 21*, 401 So.2d at 769 ("'(T)he whole tendency of our decisions is to require a plaintiff to try his whole cause of action and his whole case at one time.'" (citations omitted)).  "Under both Alabama law and federal law, the doctrine of *res judicata* prohibits the relitigation of all matter which was or could have been litigated in the prior action." *Century 21*, 401 So.2d at 768 (emphasis added).

In this case, all of Plaintiffs' claims, which are essentially challenges to the permit, were or could have been brought in the earlier proceedings.  With respect to issues raised by Count 1 of Plaintiffs' Second Amended Complaint,[33]  the court finds that the administrative record addressed all of the Plaintiffs' concerns.  With respect to the contingency planning issues raised in Paragraphs 29, 32, 33, and 36-38 of the Second Amended Complaint, the Commission's Hearing Officer reviewed all regulatory requirements for a contingency plan and found that the contingency plan of the Army and Westinghouse "complies with the requirements of ADEM Admin. Code R. 335-14-5-.04." (Recommendation of the Hearing Officer at 502-03; at 596 Conclusion of Law 4). Subsequently, the Alabama Court of Civil Appeals found: "The hearing officer's findings of fact are fully supported by the record, and Families does not dispute them." *Families*, 826 So. 2d at 872

---

[33]   Count 1 generally asserts violations of Alabama RCRA Rules concerning contingency planning, emergency procedures (Second Amended Complaint, ¶ 29), requirements for general inspections for and remedy of any malfunctions, deteriorations or operator errors (Second Amended Complaint, ¶ 30), and requirements that the facility be designed, constructed, maintained and operated so as to minimize the possibility of unplanned sudden or non-sudden releases of hazardous wastes (Second Amended Complaint, ¶ 31).  The Plaintiffs then allege that the Defendants have violated these various requirements (Second Amended Complaint, ¶¶ 33 - 38), and that the Defendants cannot identify the types of wastes they will be expected to treat (Second Amended Complaint, ¶ 32).

(Ala. Civ. App. 2002).

With respect to the Plaintiffs' Count 1 allegations that the Defendants do not have an adequate inspection program as required by Rule 335-14-5-.02(6), the Hearing Officer found that Rule 335-14-8-.02 vests ADEM with the authority to determine that a permit application is complete. (Recommendation of the Hearing Officer at 622 Conclusions of Law 3, 4 & 5). An editorial notation in Rule 335-14-8-.02(5)(b)(5) specifically requires that the permit application include the inspection schedule required by Rule 335-14-5-.02(6)(b) (the specific rule referenced by the Plaintiffs here). The Hearing Officer determined the adequacy of the entire permit application (including the sufficiency of the inspection schedule) as reviewed by ADEM. (Recommendation of the Hearing Officer at 622 Conclusion of Law 6).

The Plaintiffs' assertion that the Defendants cannot identify or quantify the chemicals expected to be emitted (Second Amended Complaint ¶ 32), was also addressed by the Hearing Officer's Recommendation adopted by the Commission. (Recommendation of the Hearing Officer at 537; Transcript of Administrative Hearing at 3933-34). The Hearing Officer specifically found that "[t]he products from incineration, decontamination, and age . . . are included in the Permit Application at Tables C-1-13, 14 and 15 . . . ." (Recommendation of the Hearing Officer at 619 Finding 7). Thus, this allegation was thoroughly considered in the Administrative Hearing, and the evidence clearly showed that all wastes were identified in a manner that complies with the requirements of the Alabama RCRA Regulations.

Finally, with respect to Plaintiffs' Count 1 allegation that Defendants have not sampled and analyzed all wastes prior to beginning treatment, the same issues were raised in the administrative proceeding using the same allegation that the regulatory requirements can only be met by sampling

45

and analysis of all wastes.  As explained earlier, the Hearing Officer determined that ADEM has the discretion under Rule 335-14-8-.02(1)(c) to approve the Army's use of knowledge and relevant information to characterize the wastes without sampling each item.  (Recommendation of the Hearing Officer  at 539; at 619-20 Findings 6-10; & at 621-22 Conclusions of Law 1, 4 & 5).  ADEM and the Administrative Hearing Officer concluded that this alternative was particularly appropriate with respect to these chemical weapons, since the nature of the weapons makes sampling too dangerous. (Transcript of Administrative Hearing at 3928).

The administrative record also addressed the various specific hazardous wastes and constituents now raised again by the Plaintiffs in Count 2.[34]  The evidence demonstrated that the permit application specifically listed hazardous wastes that are expected to be present and treated at the ANCDF by using specific regulatory waste code numbers found in Alabama's RCRA Regulations.  With the respect to the individual wastes identified by the Plaintiffs in Count 2 – that is, arsenic, mercury, and low pH wastes – the Hearing Record contains evidence that the permit application lists, *inter alia*, hazardous waste codes D004 through D011 (Transcript of Administrative Hearing at 2140).  Waste code D004 is arsenic.  (ADEM Admin. Code R. 335-14-2-.03(5) Table 1).  Likewise, mercury is identified in the permit application via the listing of Waste Code D009.  (Transcript of Administrative Hearing at 2140; ADEM Admin. Code R. 335-14-2-.03(5) Table 1).  Low pH (highly acidic) wastes, including waste containing hydrogen fluoride are considered to be reactive under the hazardous waste regulations (ADEM Admin. Code R. 335-14-02-.03(4) (which includes materials that react violently in water)), and are to use the hazardous waste code D003.  (*Id.*)

---

[34]  In Count 2, Plaintiffs focus on the allegation that the Defendants have not properly or completely characterized the hazardous wastes to be treated at the facility.

 The permit application includes the D003 waste code to identify one of the characteristics of the wastes, and this characterization is supported by an EPA memorandum which states that chemical weapons are reactive in nature.  (Recommendation of the Hearing Officer at 536, citing Transcript of Administrative Hearing at 3919, 3921-22).

Plaintiffs also challenged in the prior administrative proceeding the alleged failure to review and disclose the history of the containers and weapons to be incinerated at the facility, including the presence of the agent Lewisite.  They raise that issue again in Count 2 of the Second Amended Complaint.  Yet the hearing record demonstrates that the permit application identified Lewisite specifically, and ADEM imposed limitations for Lewisite in the permit.  (Recommendation of the Hearing Officer at 507-08).

Plaintiffs argue that their claims cannot be subject to *res judicata* because many "new" issues that arose after the close of the administrative proceeding record form the basis of their claims in this case.  The court is not persuaded by this argument.  In fact, Plaintiffs' "new" evidence is not new at all, given that Plaintiffs' Second Amended Complaint simply repeats the same concerns previously articulated in the permitting process and addressed by ADEM and the permit.  Moreover, none of these new concerns are permit violations.  For example, Plaintiffs' issue regarding "revelations about the unreliability of the ACAMS" was raised by Plaintiffs in the permitting process and addressed by the permit, which requires ANCDF to use ACAMS devices for stack monitoring.  (Doc. # 57, Ex. 1, at 187).  Plaintiffs' "new" issue regarding "agent releases from the DFS heated discharge conveyor bin enclosure area" is likewise not a permit violation.  As discussed at length by the court in Section IV.D.1, *supra*, there is no evidence that agent has been released from the DFS bin enclosure area, only evidence that agent has been detected in the area, which is not a permit violation.  Plaintiffs'

"new" issue about the accumulation of ash at the opening of the furnace is merely an objection to the design and performance of the DFS, the requirements of which are set forth in the permit. Plaintiffs' "new" evidence regarding gelled or crystallized agent and higher levels of metals in certain munitions than originally anticipated was considered by ADEM in allowing ANCDF to begin hazardous waste operations. Finally, Plaintiffs' "new" evidence regarding "the extent of the mercury emission problem" is without factual basis.

Plaintiffs have presented no evidence (old or new) of permit violations by ANCDF from mercury emissions, nor has ANCDF been cited for any permit violation concerning mercury emissions. All of these challenges are simply repeat collateral attacks on the adequacy of the permit to address these concerns. Accordingly, because all of the elements of res judicata are satisfied in this case, summary judgment is due to be granted.

## VI.   Conclusion

As outlined above, Plaintiffs have not presented sufficient evidence of current, continuing violations in order to sustain their claims under 42 U.S.C. § 6972(a)(1)(A). The undisputed evidence indicates that no violations have occurred and that, regardless of whether Plaintiffs assert violations of the permit or of regulations, their claims have no merit. Plaintiffs' claims in this case are nothing more than a thinly veiled effort to collaterally challenge the conditions of the permit. The court finds that no genuine issues of material fact remain for trial as to Plaintiffs' claims and that Defendants are entitled to judgment as a matter of law. A separate Final Judgment will be entered.

**DONE** and **ORDERED** this _____18th_____ day of March, 2005.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE